UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

U.S. SPECIALTY INSURANCE COMPANY,          :

               Plaintiff,          :

      v.          :          Docket No: _____

RICHMOND COUNTY COUNTRY CLUB,          :

            Defendant.          :

------------------------------------------------------------x

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.

★ JUN 2 5 2010 ★

BROOKLYN OFFICE

10   2939

IRIZARRY, J.

AZRACK, M.J.

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, U.S. Specialty Insurance Company (hereinafter "USSIC"), by and through its undersigned attorneys, as and for its Complaint against defendant Richmond County Country Club ("Richmond County"), alleges as follows:

### NATURE OF THE ACTION

1.    This is an action for a declaratory judgment arising out of an actual and existing controversy of a justiciable nature concerning the parties' rights, obligations, duties and liabilities in connection with the lawsuit styled *Rose Marie Reilly, et al. v. Richmond County Country Club*, (Index No. 102479/08), currently pending in the Supreme Court of the State of New York, Richmond County (the "Reilly Action").

2.    USSIC is entitled to a declaration that there is no coverage available under a policy of insurance issued by USSIC (the "Policy" or "USSIC Policy") to Richmond County in connection with the Reilly Action.

3.    USSIC is entitled to a declaration that there is no coverage available under the USSIC Policy for the Reilly Action because:

(1)    The conduct that forms the basis of the Reilly Action does not constitute a "Wrongful Act" within the meaning of the Policy;

(2)    Any ultimate judgment or settlement amounts flowing from Richmond County's purported failure to pay gratuities under New York Labor Law §196-d do not constitute "Loss" or are otherwise excluded from the definition of "Loss" as that term is defined in the Policy and as a matter of law; and

(3)    Exclusion E of the USSIC Policy excludes coverage for "Claim[s]...based on any WRONGFUL ACT which is, or alleged to be ... a willful or reckless violation of any statute... ."

## THE PARTIES

4.    USSIC is a corporation organized and existing under the laws of the State of Texas, with its principal place of business located at 13403 Northwest Freeway, Houston, Texas 77040.

5.    Richmond County is a not-for-profit corporation organized and existing under the laws of the State of New York, with its principal place of business located at 135 Flagg Place, Staten Island, New York 10304.

## JURISDICTION AND VENUE

6.    This is an action filed pursuant to 28 U.S.C. § 1332, as well as the Declaratory Judgment Act and Rule 57 of the *Federal Rules of Civil Procedure*.

7.    The parties to this action have diversity of citizenship, and jurisdiction rests in this Court pursuant to 28 U.S.C. §§ 2201, 2202 and 1332.

8.    The action arises out of a demand issued from defendant for defense and indemnification under a policy of insurance issued by USSIC.

9.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the controversy occurred in this federal district and because the defendant resides in this district.

10.    As shown below, there is a justiciable controversy that requires the Court to declare the rights, remedies, obligations and liabilities of the parties.

## FACTS GIVING RISE TO DECLARATORY JUDGMENT COMPLAINT

### The Policy

11.    USSIC issued Non-Profit Organization Liability Insurance Policy No. U708-30155 to Richmond County with a Policy Period effective February 1, 2008 through February 1, 2009 (the "Policy").   A true and correct copy of the Policy is attached hereto as Exhibit "A."

12.    Section I. of the Policy, entitled "INSURING AGREEMENT," provides, in pertinent part, as follows:

> INSURING AGREEMENT
>
> The Company shall pay on behalf of the **INSURED** all **LOSS** and **DEFENSE COSTS** that the **INSURED** becomes legally obligated to pay solely because of a **CLAIM** first made against the **INSURED** during the **POLICY PERIOD**, or the Extended Reporting Period if in effect, for a **WRONGFUL ACT** committed or allegedly committed by the **INSURED**.

13.    "Wrongful Act" is defined at Section III.I of the Policy as follows:

> **WRONGFUL ACT** means any error, misstatement, misleading statement, act omission, neglect or breach of duty committed, attempted or allegedly committed or attempted, by any **INSURED**, individually or otherwise, in an **INSURED** capacity, including **WRONGFUL EMPLOYMENT PRACTICES, PERSONAL INJURY** or **THIRD PARTY DISCRIMINATION**.

1236283-1

14.     The term "Insured" is defined at Section III.C of the Policy (as amended by Endorsement No. 5), in relevant part, as follows:

> **INSURED** means the **ORGANIZATION** set forth in Item 1 of the Declarations, and any past, present or future duly elected or appointed Directors, Officers, Trustees, Employees, Volunteers or Committee Members of the **ORGANIZATION** in their capacity as such....

15.     The term "Organization" is defined at Section III.E of the Policy to include "[t]he Non-Profit Organization named in Item 1 of the Declarations..."

16.     Richmond County is the Organization listed in Item 1 of the Declarations. Accordingly, Richmond County is an Insured.

17.     As current and/or former Richmond County employees, plaintiffs are also Insureds.

18.     The term "Claim" is defined at Section III.A of the Policy (as amended by Endorsement No. 6), in pertinent part, as follows:

> A.     **CLAIM** means:
>
> \*   \*   \*
>
> 2.     a civil, arbitration, regulatory or administrative proceeding for monetary relief which is commenced by:
>
> a.     service of a complaint or similar pleading;
>
> \*   \*   \*

19.     The Complaint filed in the Reilly Action constitutes a Claim.

20.     As amended by Endorsement No. 6, "Wrongful Employment Practices" are defined at Section III.J of the Policy as follows:

> **WRONGFUL EMPLOYMENT PRACTICES** means any actual or alleged:

1.    wrongful dismissal or discharge or termination of employment whether actual or constructive;

2.    employment related misrepresentations;

3.    violation of federal, state or local law concerning employment or discrimination in employment, including but not limited to, the Americans with Disabilities Act of 1992, the Civil Rights Act of 1991, the Age Discrimination in Employment Act of 1967, Title VII of the Civil Rights Act of 1964 (as amended), the Pregnancy Discrimination Act of 1978, the Civil Rights Act of 1866, the Family Medical Leave Act of 1993, the Older Workers Benefit Protection Act of 1990, the Fifth and Fourteenth Amendments of the United States Constitution, or any rule or regulation promulgated thereunder;

4.    sexual or other harassment in the workplace;

5.    wrongful deprivation of career opportunity, employment or promotion; or

6.    wrongful hiring, retention, discipline or evaluation or failure to adopt adequate employment or workplace policies and procedure.

Coverage under this Policy for **WRONGFUL EMPLOYMENT PRACTICES** shall be limited only to **CLAIMS** alleging disparate impact or vicarious liability only.

21.    As amended by Endorsement No. 5, the Policy defines the term "Loss" at

Section III.D as follows:

**LOSS** means the amount paid by the Company on behalf of the **INSURED** for damages, judgments, and settlements with respect to **CLAIMS** for which coverage hereunder applies. **LOSS** shall not include any amount which the **INSURED** is not legally obligated to pay. **LOSS** also shall not include any civil or criminal fines, penalties, sanctions or taxes or the multiplied portion of any multiplied damage award, or any matter which may be deemed uninsurable under the law pursuant to which this insurance shall be construed.

22.    As amended by Endorsement No. 6, Exclusion E of the Policy provides:

This Policy does not apply to any **CLAIM:**

E.  based on any **WRONGFUL ACT**, which is, or alleged to be, an assault and/or battery, a willful or reckless violation of any statute, or any conduct which is dishonest, willful, malicious, fraudulent or otherwise intended to cause damage or injury to persons or property.

23.    As amended by Endorsement No. 6, Exclusion G of the Policy provides:

This Policy does not apply to any **CLAIM:**

G.    which are brought by or on behalf of the **ORGANIZATION** or any entity which is controlled by, controls or is under common control with the **ORGANIZATION** or brought by or on behalf of any **INSURED**; however, this exclusion shall not apply to **CLAIMS** for **WRONGFUL EMPLOYMENT PRACTICES** brought by a present or former employee, to the extent such **CLAIMS** are otherwise covered by this Policy and falling outside Exclusion (E) above.

## The Reilly Action

24.    On July 18, 2008, the Reilly Action was filed in the Supreme Court of the State of New York, Richmond County.

25.    In the Reilly Action, plaintiffs allege that Richmond County's practice of purportedly failing to distribute the 18% to 20% "service charge" included on the Club's invoices for banquets, patio and pool dining and special events to the Club's wait staff violates New York Labor Law §196-d.  A true and correct copy of the Complaint filed in the Reilly Action is attached as Exhibit "B."

26.    Accordingly, plaintiffs seek the return of gratuities (wages) unlawfully withheld pursuant to New York Labor Law §190 and reasonable attorneys' fees pursuant

to New York Labor Law § 198.

27.     Plaintiffs further seek the imposition of a 25% penalty upon Richmond County on account of its purported "willful" violation of New York Labor Law §§196-d and 193[1] pursuant to New York Labor Law §198.

## USSIC's Coverage Position

28.     Given that plaintiffs in the Reilly Action and Richmond County are both Insureds, Exclusion G applies. Exclusion G limits the types of Wrongful Acts, which may be asserted in Claims made by Insureds against other Insureds.

29.     Exclusion G, however, does not apply to Claims asserting Wrongful Employment Practices made by current or former employees (such as the Reilly plaintiffs). Here, the only types of potentially covered Wrongful Acts plaintiffs may assert in the Reilly Action are Wrongful Employment Practices by virtue of Exclusion G.

30.     By letter dated August 29, 2008, USSIC reserved its rights to deny coverage to the extent the Reilly Action did not assert Wrongful Acts. A true and correct copy of USSIC's August 29, 2008 letter is attached hereto as Exhibit "C."

31.     In the Reilly Action, plaintiffs do not allege violations of New York Labor Law §196-d on a vicarious liability basis against Richmond County.

32.     The Policy only provides coverage for Wrongful Employment Practices alleging disparate impact or based upon an Insured's vicarious liability. Accordingly, the Reilly Action fails to allege any Wrongful Employment Practices. As a result, the Policy's Insuring Agreement is not triggered in the first instance since no Wrongful Acts are asserted; and USSIC does not have any coverage obligations (defense or indemnity) for the Reilly Action.

33.   In the August 29, 2008 letter, USSIC further reserved its rights to deny coverage pursuant to Exclusion E [Policy does not apply to any Claim based upon any Wrongful Acts involving a willful or reckless violation of any statute] and based upon the definition of Loss.

## Count I

### For A Declaratory Judgment that the Policy
### Does Not Provide Coverage for the
### Reilly Action

34.   USSIC realleges and incorporates by reference the allegations of Paragraphs 1 through 33 above.

35.   Inasmuch as the Reilly Action does not assert Wrongful Acts, USSIC is entitled to a judgment declaring that the Policy is not implicated by the Reilly Action for either the defense of Richmond County or indemnification of any judgment or settlement amounts.

## Count II

### For A Declaratory Judgment that in the Event the Policy
### Is Implicated by the Reilly Action, There is No Indemnity Coverage For Any
### Judgment or Settlement Amounts

36.   USSIC realleges and incorporates by reference herein the allegations of Paragraphs 1 through 35 above.

37.   In the event that there were otherwise coverage available for the Reilly Action (which USSIC disputes), the damages sought by plaintiffs in the Reilly Action do not constitute Loss. Specifically, plaintiffs seek damages flowing from Richmond County's allegedly improper withholding of gratuities (wages).

38.     The Policy's Insuring Agreement provides that USSIC shall pay on behalf of the Insured, Loss that the Insured becomes legally obligated to *pay solely because of a Claim first made during the Policy Period alleging a Wrongful Act*. In the Reilly Action, pursuant to New York Labor Law §196-d, Richmond County's statutory duty to pay gratuities collected, arose when the gratuities were collected and not when the Claim was first made.   As such, any amounts purportedly owed to the Reilly plaintiffs do not constitute Loss, but rather reflect a pre-existing debt or obligation, which is uninsurable as a matter of law.   Similarly, USSIC does not have any indemnity obligations for any other damages (i.e., attorneys' fees) flowing from Richmond County's alleged improper withholding of gratuities, as such damages would not exist but for Richmond County's failure to pay a pre-existing debt or obligation.

39.     In addition to the foregoing, to the extent that any judgment or settlement consists of damages arising out of or attributable to the 25% penalty sought by plaintiffs, pursuant to New York Labor Law §198, USSIC is entitled to a judgment that there is no coverage available for such damages insofar as such relief is excluded from the Policy's definition of Loss, as it constitutes a civil fine and/or penalty.

40.     Further, to the extent that any judgment or settlement consists of damages arising out of or attributable to the 25% penalty sought by plaintiffs, pursuant to New York Labor Law §198, such relief is also excluded from coverage by virtue of Exclusion E, which precludes coverage for willful violations of statute.

41.     Based upon the foregoing, even assuming that there were otherwise coverage available for the Reilly Action, USSIC is entitled to a judgment that there is no coverage available for any of the relief sought by plaintiffs in the Reilly Action.

**WHEREFORE**, USSIC requests that this Court enter a declaration and final judgment in its favor:

(A)    Declaring that for the reasons set forth in Count I, the Policy does not afford coverage (defense or indemnification) to Richmond County in connection with the Reilly Action;

(B)    Declaring that for the reasons set forth in Count II, there is no coverage under the Policy for any ultimate judgment or settlement amounts in connection with the Reilly Action;

(C)    Awarding USSIC such other and further relief as shall be found to be reasonable; and

(D)    Awarding USSIC its fees and costs incurred in prosecuting this action.

Dated: June 23, 2010

By: _____
Scott A. Schechter, Esq. (SAS: 8369)
Elan R. Kandel, Esq.  (EK: 8345)
Kaufman Borgeest & Ryan LLP
120 Broadway, 14th Floor
New York, NY 10271
Phone: 212-980-9600
Fax: 212-980-9291
Email:  sschechter@kbrlaw.com
        ekandel@kbrlaw.com

*Counsel   for   Plaintiff,   U.S.   Specialty Insurance Company*



# U.S. SPECIALTY INSURANCE COMPANY

ADMINISTRATIVE OFFICES: 13403 NORTHWEST FREEWAY, HOUSTON, TEXAS 77040

## DECLARATIONS
## NON-PROFIT ORGANIZATION LIABILITY INSURANCE
## <u>THIS IS A CLAIMS MADE POLICY</u>

**Broker:** 2500440
AON ASSOCIATION SERVICES

**No:** U708-30155
**Renewal of No:** U707-30229

**Item 1.**  **ORGANIZATION:** RICHMOND COUNTY COUNTRY CLUB

**Item 2.**  Address:     135 FLAGG PLACE
STATEN ISLAND, NY 10304

**Item 3.**  **POLICY PERIOD:**        Inception Date:  2/01/08  Expiration Date:  2/01/09
12:01 A.M. Standard Time at the address of the
**ORGANIZATION** herein.

**Item 4.**  Limit of Liability:       $  5,000,000       Each **CLAIM** and in the Aggregate for
all **CLAIMS** Including **DEFENSE COSTS.**

**Item 5.**  Deductible:              $      5,000       Each **CLAIM** including **DEFENSE COSTS.**

**Item 6.**  Premium:                $      5,665

**Item 7.**  Endorsements attached at Issuance:  (1)NP0006,(2)NP0007,(3)NP0009,
(4)NP0005,(5)NP0108,(6)NP0069,(7)NP0091,(8)NP0092,
(9)NP0094,(10)NP0137.

by _____
Authorized Representative

**NP0001 (10/01)**

ORIGINAL

# *Endorsement*

ORGANIZATION:    RICHMOND COUNTY COUNTRY CLUB              Page 1 of 2

## NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT(BROAD)

In consideration of the premium charged, it is understood and agreed
that this Policy of insurance does not apply:

I.   Under any Liability Coverage, to injury, sickness, disease, death
     or destruction

     (a) with respect to which an insured under the policy is also an
         insured under a nuclear energy liability policy issued by
         Nuclear Energy Liability Insurance Association, Mutual Atomic
         Energy Liability Underwriters or Nuclear Insurance Association
         of Canada, or would be an insured under any such policy but
         for its termination upon exhaustion of its limit of liability;
         or

     (b) resulting from the hazardous properties of nuclear material
         and with respect to which (1) any person or organization is
         required to maintain financial protection pursuant to the
         Atomic Energy Act of 1954, or any law amendatory thereof, or
         (2) the insured is, or had this policy not been issued would
         be, entitled to indemnity from the United States of America,
         or any agency thereof, under any agreement entered into by the
         United States of America, or any agency thereof, with any
         person or organization.

II.  Under any Medical Payments Coverage, or under any Supplementary
     Payments Provision relating to immediate medical or surgical
     relief, to expenses incurred with respect to bodily injury,
     sickness, disease or death resulting from the hazardous
     properties of nuclear material and arising out of the operation
     of a nuclear facility by any person or organization.

III. Under any Liability Coverage, to injury, sickness, disease, death
     or destruction resulting from the hazardous properties of nuclear
     material, if

     (a) the nuclear material (1) is at any nuclear facility owned by,
         or operated by or on behalf of, any insured or (2) has been
         discharged or dispersed therefrom;

     (b) the nuclear material is contained in spent fuel or waste at
         any time possessed, handled, used, processed, stored,
         transported or disposed of by or on behalf of an insured; or

     (c) the injury, sickness, disease, death or destruction arises out
         of the furnishing by an insured of services, materials, parts
         or equipment in connection with the planning, construction,
         maintenance, operation or use of any nuclear facility, but if
         such facility is located within the United States of America,
         its territories or possessions or Canada, this exclusion (c)
         applies only to injury to or destruction of property at such
         nuclear facility.

*Endorsement*

NUCLEAR INCIDENT EXCLUSION, Continued                    Page 2 of 2

IV.  As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive
properties; "nuclear material" means source material, special nuclear
material or byproduct material; "source material", "special nuclear
material", and "byproduct material" have the meanings given them in
the Atomic Energy Act 1954 or in any law amendatory thereof; "spent
fuel" means any fuel element or fuel component, solid or liquid, which
has been used or exposed to radiation in a nuclear reactor; "waste"
means any waste material (1) containing byproduct material and (2)
resulting from the operation by any person or organization of any
nuclear facility included within the definition of nuclear facility
under paragraph (a) or (b) thereof; "nuclear facility" means

   (a) any nuclear reactor;

   (b) any equipment  or  device  designed or used for (1) separating
       the  isotopes  of  uranium  or  plutonium,  (2)  processing or
       utilizing spent fuel, or (3) handling, processing or packaging
       waste;

   (c) any  equipment  or device used for the processing, fabricating
       or alloying  of  special  nuclear  material if at any time the
       total amount of such material in the custody of the insured at
       the  premises  where  such  equipment  or  device  is  located
       consists of  or  contains  more  than 25 grams of plutonium or
       uranium 233 or any combination thereof, or more than 250 grams
       of uranium 235;

   (d) any  structure,  basin, excavation, premises or place prepared
       or used for the storage or disposal of waste;

and includes the site on which any of the foregoing is located, all
operations conducted on such site and all premises used for such
operations;  "nuclear reactor" means any apparatus designed or used to
sustain nuclear fission in a self-supporting chain reaction or to
contain a critical mass of fissionable material.  With respect to
injury to or destruction of property, the word "injury" or
"destruction" includes all forms of radioactive contamination of
property.

It is understood and agreed that, except as specifically provided in
the foregoing to the contrary, this clause is subject to the terms,
exclusions, conditions and limitations of the policy of Insurance to
which it is attached.

All other terms and conditions remain unchanged.

Endorsement effective  2/01/08        Policy No. U708-30155
Endorsement No.    1

                              by_____
                                  (Authorized Representative)

NP0006 (10/01)

# *Endorsement*

ORGANIZATION:    RICHMOND COUNTY COUNTRY CLUB

### WRONGFUL EMPLOYMENT PRACTICES DEDUCTIBLE ENDORSEMENT

In consideration of the premium charged, it is understood and agreed that with respect to any CLAIM for, based on or arising out of allegations of WRONGFUL EMPLOYMENT PRACTICES, a separate deductible of $7,500 shall apply.  The deductible set forth in this Endorsement shall apply to LOSS and DEFENSE COSTS, and the Company shall only be held liable to make payment in excess of said deductible and subject to the limits of liabiity of the Policy.

All other terms and conditions remain unchanged.

Endorsement effective   2/01/08          Policy No. U708-30155

Endorsement No.    2

by_____
                  (Authorized Representative)

NP0007 (10/01)

# Endorsement

ORGANIZATION:   RICHMOND COUNTY COUNTRY CLUB

### PROFESSIONAL LIABILITY EXCLUSION

In consideration of the premium charged, it is understood and agreed
that no coverage will be available under this Policy for CLAIMS based
upon, arising out of, directly or indirectly, resulting from, in
consequence of, or in any way involving any actual or alleged act,
error, omission, misstatement, misleading statement or breach of duty
in connection with the rendering of, or actual or alleged failure to
render, any professional services for others by any INSURED.

All other terms and conditions remain unchanged,

Endorsement effective  2/01/08        Policy No. U708-30155

Endorsement No.   3

by_____
                    (Authorized Representative)

NP0009 (2/07)

# *Endorsement*

ORGANIZATION:    RICHMOND COUNTY COUNTRY CLUB

## PENDING & PRIOR LITIGATION EXCLUSION

In consideration of the premium charged, it is understood and agreed
that coverage is not afforded hereunder in respect to any CLAIM made
against the INSURED, including but not limited to, any LOSS or DEFENSE
COSTS, by reason of any litigation pending on or prior to the date
specified below, including any CLAIMS based upon the factual
background, allegations or underlying causes of such pending or prior
litigation.

                        2/01/06

All other terms and conditions remain unchanged.

Endorsement effective  2/01/08           Policy No. U708-30155

Endorsement No.   4

                            by_____
                               (Authorized Representative)

NP0005 (10/01)

## *Endorsement*

ORGANIZATION:     RICHMOND COUNTY COUNTRY CLUB

### NCA ENDORSEMENT

In consideration of the premium charged, it is hereby understood
and agreed that the Section of this Policy entitled III. DEFINITIONS
is amended as follows:

Part C. 4 is deleted in its entirety and replaced by the following:

4. The spouses or domestic partners of any past, present, or future
   duly elected or appointed Directors, Officers, Trustees,
   Employees, Volunteers or Committee Members of the ORGANIZATION,
   or the estates, heirs, legal representatives, or assigns of
   such persons, but only to the extent that CLAIMS are asserted
   against such spouses or domestic partners arising solely out of
   any actual or alleged WRONGFUL ACT of the spouse who is insured
   under this definition.

Part C. is amended to include:

5. Any outside position of a director, officer, trustee or other
   equivalent position held by any of the directors, officers or
   trustees of the ORGANIZATION, at any other non-profit entity,
   if service in such position is at the specific request and
   direction of the ORGANIZATION.

Part D. is deleted in its entirety and replaced by the following:

LOSS means the amount paid by the Company on behalf of the INSURED
for damages, judgments, and settlements with respect to CLAIMS for
which coverage hereunder applies. LOSS shall not include any amount
which the INSURED is not legally obligated to pay. LOSS also shall not
include any civil or criminal fines, penalties, sanctions or taxes
or the multiplied portion of any multiplied damage award, or any
matter which may be deemed uninsurable under the law pursuant to which
this insurance shall be construed.

It is further understood and agreed that Section VII. OTHER CONDITIONS
AND AGREEMENTS, G. SETTLEMENT OF CLAIM, is deleted in its entirety
and replaced by the following:

G. SETTLEMENT OF CLAIM

1. The Company shall not settle or satisfy any CLAIM without the
   consent of the INSURED. If the INSURED elects not to settle
   or satisfy a CLAIM as recommended by the Company and
   acceptable to the claimant, then subject to the Limit of
   Liability of this Policy, the Company's liability for all
   LOSS, and DEFENSE COSTS shall not exceed:

   a) the amount of the recommended settlement plus DEFENSE
      COSTS incurred up to the date of the INSURED'S refusal
      to consent to the recommended settlement of such CLAIM;
      plus

# *Endorsement*

b) Seventy percent (70%) of any LOSS and DEFENSE COSTS, in excess of the amount referenced in paragraph a., above, incurred in connection with such CLAIM; subject in all events to the applicable Retention and the available Limit of Liability for such CLAIM. The remaining thirty percent (30%) of any LOSS and DEFENSE COSTS, in excess of the amount referenced in paragraph a. above will be borne by the INSURED as uninsured and at its own risk.

2. The INSURED shall not assume or admit liability for, or pay settle or satisfy any CLAIM, either as to LOSS or DEFENSE COSTS, without the Company's prior written consent, except at the INSURED'S own expense.

It is further understood and agreed that SECTION VII. OTHER CONDITIONS AND AGREEMENTS is amended by the addition of the following:

3. Not withstanding Clause VII (A) 2 above, no deductible shall apply to any CLAIM which is in the form of a civil litigation for monetary relief, and the Company shall reimburse the DEFENSE COSTS paid by the INSUREDS within the deductible, in the event of a determination of NO LIABILITY for all INSUREDS. The foregoing shall only be applicable where the deductible is $7,500 or less.

It is further understood and agreed that SECTION III. DEFINITIONS is amended by the addition of the following:

NO LIABILITY means a final, non-appealable dismissal with prejudice and/or judgement or settlement involving no monetary liability.

It is further understood and agreed that the Company will pay LOSS and DEFENSE COSTS resulting from any CLAIM, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the actual or alleged denial of membership or other action regarding membership status in the ORGANIZATION in violation of common law, statutes, regulations, administrative orders or rulings pertaining to civil rights and/or discrimination on account of race, color, creed, ethnicity, national origin, gender, sexual preference, marital status, age and/or physical or mental impairment, handicap or disability.

All other terms and conditions remain unchanged.

Endorsement effective  2/01/08          Policy No. U708-30155

Endorsement No.    5

by _____
                   (Authorized Representative)

NP0108

# *Endorsement*

ORGANIZATION:    RICHMOND COUNTY COUNTRY CLUB

## NEW YORK AMENDATORY ENDORSEMENT

It is hereby understood and agreed that Defense, Investigation and Settlement of Claims, Clause II, of the Policy is amended by adding the following after the first sentence of the paragraph:

> The INSURED shall have the right to participate in, and assist in the direction of, the defense to any CLAIM, including the right to consent to the Company's choice of defense counsel, which consent shall not be unreasonably withheld.

It is further understood and agreed that Definitions, Clause III (J), is amended by adding the following at the end thereof:

> Coverage under this Policy for WRONGFUL EMPLOYMENT PRACTICES shall be limited to CLAIMS alleging disparate impact or vicarious liability only.

It is further understood that Definitions, Clause III (A), is amended by deleting the words "or non-monetary relief" from subparagraph 2.

It is further understood and agreed that Exclusions, Clause V (E) is deleted in its entirety and replaced by the following:

> E.  based on any WRONGFUL ACT, which is, or alleged to be, an assault and/or battery, a willful or reckless violation of any statute, or any conduct which is dishonest, willful, malicious, fraudulent or otherwise intended to cause damage or injury to persons or property.

It is further understood and agreed that Exclusions, Clause V (G) is deleted in its entirety and replaced by the following:

> G.  which are brought by or on behalf of the ORGANIZATION or any entity which is controlled by, controls or is under common control with the ORGANIZATION or brought by or on behalf of any INSURED; however, this exclusion shall not apply to CLAIMS for WRONGFUL EMPLOYMENT PRACTICES brought by a present or former employee, to the extent such CLAIMS are otherwise covered by this Policy and falling outside Exclusion (E) above.

It is further understood and agreed that Other Conditions and Agreements, Clause VII (H) of the Policy, is deleted in its entirety and replaced by the following:

# *Endorsement*

H.   CANCELLATION OR NONRENEWAL:

1.   This Policy may be cancelled by the INSURED at any time by surrender of the Policy to the Company or its duly authorized agent or by mailing to the Company written notice stating when thereafter the cancellation shall be effective.

2.   If this Policy has been in effect for less than sixty (60) days, this Policy may be cancelled by the Company by mailing or delivering to the INSUREDS' representative designated in the application, at the address of the ORGANIZATION shown in this Policy, and to the INSURED'S authorized insurance agent or broker, written notice stating when, not less than thirty (30) days thereafter (fifteen (15) days thereafter in the event of non-payment of premium), such cancellation shall be effective.

3.   If this Policy has been in effect for sixty (60) days or more (unless cancelled pursuant to paragraph 2 above), or on or after the effective date if this Policy is a renewal, no notice of cancellation shall become effective until thirty (30) days (or fifteen (15) days in the event of non-payment of premium) after notice of cancellation is mailed or delivered to the INSUREDS' representative, at the address of the ORGANIZATION shown in this Policy, and to the INSURED'S authorized insurance agent or broker.  Such cancellation must be based upon one or more of the following reasons:

   a) non-payment of premium;

   b) conviction of a crime arising out of acts increasing the hazard insured against;

   c) discovery of fraud or material misrepresentation in the obtaining of this Policy or in the presentation of a claim thereunder;

   d) after issuance of the Policy or after the last renewal date, discovery of an act or omission, or a violation of any Policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to the inception of the current Policy;

   e) material change in the nature or extent of the risk insured, occurring after issuance or last annual renewal anniversary date of the Policy, which causes the hazard insured against to be substantially and materially increased beyond that which was contemplated at the time the Policy was issued;

   f) a determination by the New York Superintendent of Insurance that continuation of the present premium volume of the Company would jeopardize the Company's solvency or be

# *Endorsement*

hazardous to the interests of the Company's policyholders, its creditors, or the public; or

g) a determination by the Superintendent of Insurance that continuation of the Policy would violate, or would place the Company in violation of, New York Insurance Law.

Any notice of cancellation by the Company shall specify the reason(s) therefor.

4. If this Policy shall be cancelled by the INSURED, the Company shall retain the customary short rate earned premium.  If this Policy shall be cancelled by or on behalf of the Company, the Company shall retain the customary pro rata earned premium. Payment or tender of any unearned premium by the Company shall not be a condition precedent to the effectiveness of cancellation but such payment shall be made as soon as practicable.

5. The Policy shall remain in full force and effect, subject to the same terms, conditions and rates, unless the Company shall mail or deliver to the INSUREDS' representative, at the address of the ORGANIZATION shown in this Policy, and to the INSURED'S authorized insurance agent or broker, written notice of the Company's intention:

a) not to renew this Policy, or

b) to condition renewal upon change of limits, change in type of coverage, increased deductible or addition of exclusion, or upon increased premiums in excess of ten percent (10%) (exclusive of any premium increase generated as a result of increased exposure units, pursuant to New York Insurance Law section 3426(d), or as a result of experience rating, loss rating, retrospective rating or audit), or

c) that the Policy will either not be renewed or will not be renewed upon the same terms, conditions or rates, such alternative notice shall further advise that a second notice shall be mailed or delivered at a later date indicating the Company's intention specified in (a) or (b) of this paragraph and that the coverage afforded by this Policy shall continue on the same terms, conditions and rates as the expiring Policy, until the later of the expiration date or sixty days after the second notice is mailed or delivered.

If notice is transmitted in accordance with (c) of this paragraph, such alternative notice as set forth within this subparagraph shall also advise of the INSUREDS' representative of the availability of loss information which shall be furnished to the INSUREDS' representative within twenty (20) days of receipt by the Company of a written request from the INSUREDS' representative for such loss information.

Page 4 of 7

6.  The notice specified in (a), (b) or (c) of paragraph 5 above
    shall be mailed or delivered not less than sixty (60) days
    prior to the Policy expiration date, but not more than one
    hundred twenty (120) days prior to the Policy expiration date.
    The written notice of nonrenewal or conditional renewal shall
    state the reason(s) therefor, set forth the amount of any
    premium increase (or, where such amount cannot reasonably be
    determined as of the time the notice is provided, a reasonable
    estimate of the premium increase based upon the information
    available to the Company at that time), and describe in plain
    and concise terms the nature of any other proposed changes in
    conditions.

7.  (a) If the Company mails or delivers to the INSUREDS'
        representative an alternative renewal notice pursuant to
        (c) of paragraph 5 above, the Policy shall remain in
        full force and effect, subject to the same terms,
        conditions and rates of the expiring Policy, until the
        later of the expiration date or sixty days after the
        mailing or delivery of the second notice described
        therein, except to the extent that, prior thereto,
        the INSURED has replaced the coverage or elects to
        cancel, in which event such cancellation shall be on
        a pro rata premium basis.

    (b) If the Company provides a late notice pursuant to (a) or
        (b) of paragraph 5 above prior to the expiration of the
        POLICY PERIOD, the Policy shall remain in full force and
        effect, subject to the same terms and conditions of the
        expiring Policy and at the lower of the current rates or
        the rates used for the Policy, until sixty (60) days after
        notice is mailed or delivered, except to the extent that,
        prior thereto, the INSURED has replaced the coverage or
        elects to cancel, in which event such cancellation shall be
        on a pro rata premium basis.  In the event the INSURED
        elects to renew the Policy on the basis of a conditional
        notice pursuant to (b) of paragraph 5 above, then the
        terms, conditions and rates of the renewal policy shall
        govern the Policy upon expiration of the sixty (60) day
        period unless such notice was provided at least thirty (30)
        days prior to the expiration date of the Policy, in which
        case the terms, conditions and rates set forth in the
        conditional renewal notice shall apply as of the renewal
        date.

(c) In the event a late notice is provided by the Company pursuant to (a) or (b) of paragraph 5 above after the expiration of the Policy, the Policy shall remain in effect on the same terms and conditions of the expiring Policy for another required POLICY PERIOD, at the lower of the current rates or the expiring Policy's rates, unless the INSURED during the additional POLICY PERIOD has replaced the coverage or elects to cancel, in which event such cancellation shall be on a pro rata premium basis.

d) Any extension of the POLICY PERIOD pursuant to this paragraph 7 shall not create a new aggregate Limit of Liability for the Policy, except that the annual aggregate Limit of Liability of the expiring Policy shall be increased in proportion to the length of the Policy extension pursuant to this paragraph. In the event the INSURED elects to accept the terms, conditions and rates of the conditional renewal notice pursuant to (b) of paragraph 5 above, the Limit of Liability of the renewal policy shall govern as of the effective date of the renewal.

8. For the purpose of this Policy, notice of cancellation or nonrenewal given to the INSUREDS' representative designated in the application, at the address of the ORGANIZATION shown in the Policy, shall be deemed to be notice to all INSUREDS.

It is further understood and agreed that Insuring Agreement, Clause I, and Other Conditions and Agreements, Clause VII (A) of the Policy ise amended as follows:

If the ORGANIZATION is a corporation and a CLAIM is made against Directors or Officers thereof who are insured under this Policy, the Company shall only be liable to pay 99.9% of net LOSS (less Retention amount), in excess of the amount of the deductible and up to the applicable Limit of Liability, it being understood that the remaining .1% of each and every net LOSS (less Retention amount), in excess of the deductible shall be carried by such Directors and Officers at their own risk and uninsured. The Retention amount shall be $100 for each Officer and Director, $1,000 in the aggregate for all Officers and Directors of the ORGANIZATION.

It is further understood and agreed that, notwithstanding Clause VII (F) of this Policy, notice of CLAIM given to any licensed agent of the Company in New York State, with particulars sufficient to identify the ORGANIZATION, shall be deemed notice to the Company.

It is further understood and agreed that Other Conditions and Agreements, Clause VII (J), of the Policy is amended by deleting the words "after actual trial" from the first paragraph and deleting the second paragraph in its entirety and inserting the following in place thereof:

> Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this Policy to the extent of the insurance afforded by this Policy.   If a judgment entered against an INSURED remains unsatisfied after the expiration of thirty (30) days from the service of notice of entry of the judgment upon the attorney for the INSURED and upon the Company, then an action may, except during a stay or limited stay of execution against the INSURED on such judgment, be maintained against the Company, under the terms of the Policy for the amount of such judgment to the extent of the insurance provided by this Policy.

It is further understood and agreed that Other Conditions and Agreements, Clause VII, of the Policy is amended to include the following at the end thereof:

P.   TRANSFER OF DUTIES WHEN A LIMIT OF INSURANCE IS EXHAUSTED

1.   If the Company concludes that, based on any CLAIMS which have been reported and to which this insurance may apply, the insurance afforded by this Policy is likely to be exhausted by the payment of LOSS and/or DEFENSE COSTS, the Company shall provide written notice to that effect to the INSUREDS' representative at the address of the ORGANIZATION shown in the Policy.

2.   In the event either the Limit of Liability - Each Claim or the Limit of Liability - In the Aggregate of the Policy has actually been exhausted by the payment of LOSS or DEFENSE COSTS:

a)   The Company shall notify the INSUREDS' representative, in writing, as soon as practicable, that:

i.   such a Limit has actually been exhausted; and

ii.   the Company's duty to defend claims and suits seeking LOSS subject to that applicable Limit of Liability also has ended.

b)   The Company shall initiate, and cooperate in, the transfer of control, to any appropriate INSURED of all CLAIMS and suits seeking LOSS which are subject to that Limit and which are reported to the Company before that Limit is exhausted.   The INSURED must cooperate in the transfer of control of said CLAIMS and suits.

The Company agrees to take such steps, as the Company deems appropriate, to avoid a default in, or continue the defense of, any CLAIMS or suits until such transfer is completed, provided the appropriate INSURED is cooperating in completing such transfer.

The Company will take no action whatsoever with respect to any CLAIM or suit seeking LOSS that would have been subject to that Limit, had it not been used up, if the CLAIM or suit is reported to the Company after that Limit of Liability has been exhausted.

c) The ORGANIZATION and any other INSURED involved in a suit seeking LOSS subject to the Limit of Liability, must arrange for the defense of such CLAIM or suit within such time period as agreed to between the appropriate INSURED and the Company.  Absent any such agreement, arrangements for the defense of such CLAIM or suit must be made as soon as practicable.

3. The INSURED shall reimburse the Company for expenses incurred by the Company in taking those steps it deems appropriate in accordance with paragraph 2(b) above.

The duty of the INSURED to reimburse the Company will begin on:

a) The date on which the applicable Limit of Liability is exhausted, if the Company sent notice in accordance with paragraph 1 above; or

b) The date on which the Company sent notice in accordance with paragraph 2(a) above, if the Company did not send notice in accordance with paragraph 1 above.

c) The exhaustion of any Limit of Liability by the payment of judgments, settlements or DEFENSE COSTS (if applicable), and the resulting end of the Company's duty to defend, will not be affected by the Company's failure to comply with any of the provisions of this Endorsement.

All other terms and conditions remain unchanged.

Endorsement effective    2/01/08       Policy No.    U708-30155

Endorsement No.    6

by_____
(Authorized Representative)

NP0069 (3/97)

# *Endorsement*

ORGANIZATION:   RICHMOND COUNTY COUNTRY CLUB

## NEW YORK REGULATION 121

It is hereby expressly understood and agreed that the Declarations page
to the Policy is amended by adding the following:

Item 8:   Premium for Optional
          Extended Reporting Period

| Length of Optional Extended Reporting Period | Amount of Premium Based Upon % of Annual Amount In Item 6 |
|---|---|
| Three (3) Years | 75% (without reinstatement of aggregate limit) |
| Three (3) Years | 200% (with reinstatement of aggregate limit) |

It is further understood and agreed that Other Conditions and
Agreements, Clause VII (E) of the Policy, Extended Reporting Period
Option, is deleted in its entirety and is replaced by the following:

E.   EXTENDED REPORTING PERIODS:

   1.   If either the Company or the INSURED shall cancel or choose
        not to renew the Policy, or if there is a change in coverage
        less favorable to the INSURED, the INSURED shall be provided a
        sixty (60) day automatic Extended Reporting Period, following
        the date of cancellation or nonrenewal of the Policy or such
        change in coverage, in which to give written notice of CLAIMS
        first made against the INSURED during such automatic Extended
        Reporting Period, but only in respect of any WRONGFUL ACT
        committed or allegedly committed prior to the effective date
        of such cancellation, nonrenewal or change in coverage, and
        subsequent to the Retroactive Date, if any.

   2.   If either the Company or the INSURED shall cancel or choose
        not to renew the Policy, or if there is a change in coverage
        less favorable to the INSURED, the INSURED shall have the
        right, upon payment of an additional premium, to an additional
        period of thirty-six (36) calendar months following the
        effective date of cancellation or the date of expiration of
        the Policy or such change in coverage, in which to give
        written notice of CLAIMS first made against the INSURED during

# *Endorsement*

Page 2 of 4

such optional Extended Reporting Period, but only in respect
of any WRONGFUL ACT committed or allegedly committed prior to
the effective date of such cancellation, nonrenewal or change
in coverage, and subsequent to the Retroactive Date, if any.
Notwithstanding the foregoing, the INSURED shall not be
entitled to purchase the optional Extended Reporting Period
coverage pursuant to this paragraph if this Policy has been in
effect for less than one year and is not a renewal, and the
Policy is terminated for nonpayment of premium or for fraud.
The additional premium for such optional Extended Reporting
Period shall be:

(a) seventy-five percent (75%) of the annual premium stated in
   Item 6 of the Declarations where there is no reinstatement
   of the Limit of Liability in the Aggregate as set forth in
   paragraph 6 below, or

(b) two hundred percent (200%) of the annual premium stated in
   Item 6 of the Declarations where there is a reinstatement
   of the Limit of Liability in the Aggregate as set forth in
   paragraph 6 below.

3. Within thirty (30) days after cancellation or nonrenewal of the
   Policy or a change in coverage less favorable to the INSURED,
   the Company will advise the INSURED'S representative in writing
   of the automatic Extended Reporting Period coverage referred to
   in paragraph 1 above and the availability of, the premium for
   and the importance of purchasing the optional Extended
   Reporting Period coverage referred to in paragraph 2 above.
   If the Policy is cancelled due to nonpayment of premium or
   fraud on the part of the INSURED, the Company shall not be
   required to provide a premium quotation for Extended Reporting
   Period coverage unless requested by the INSURED.

4. The INSURED shall have the greater of the following in which
   to submit written acceptance of the optional Extended
   Reporting Period coverage:

   (a) sixty (60) days from the effective date of termination
      of the Policy, or

   (b) thirty (30) days from the date of mailing or delivery
      of the advice referred to in paragraph 3 above.

   Written notice of the INSURED'S election to purchase the
   optional Extended Reporting Period coverage, together with the
   additional premium therefor, must be received by the Company
   within the time prescribed by this paragraph.

# *Endorsement*

5. For the purpose of determining the length of the optional Extended Reporting Period in paragraph 2 above, the sixty (60) day automatic Extended Reporting Period in paragraph 1 above shall be included in the thirty-six (36) calendar month period.

6. The Extended Reporting Period coverage provided for in this endorsement shall be deemed part of the POLICY PERIOD and not in addition thereto. Where the ORGANIZATION has been afforded non-profit organization liability insurance coverage by the Company continuously for at least three (3) years, exclusive of any Extended Reporting Period, the Limit of Liability in the Aggregate for the optional Extended Reporting Period coverage shall be equal to one hundred percent (100%) of the Limit of Liability in the Aggregate for this Policy. Where the ORGANIZATION has been afforded non-profit organization liability insurance coverage by the Company for less than three (3) continuous years, the Limit of Liability in the Aggregate for the optional Extended Reporting Period shall be equal to (a) the amount of coverage remaining in the Policy's Limit of Liability in the Aggregate or (b) fifty percent (50%) of the Limit of Liability in the Aggregate for the Policy, whichever is greater. Notwithstanding the foregoing, if the INSURED is entitled to Extended Reporting Period coverage due to a decrease in limits, reduction in coverage, increased deductible or self-insured retention, new exclusion or other change in coverage less favorable to the INSURED, then the Extended Reporting Period coverage provided shall apply only in regard to that coverage terminated.

7. If this Policy has been issued to a corporation, any individual INSURED under the Policy may purchase additional Extended Reporting Period coverage pursuant to paragraph 2 above, provided:

   (a) such entity has been placed in liquidation or bankruptcy or permanently ceases operations;

# *Endorsement*

Page 4 of 4

(b) the entity or its designated trustee does not purchase Extended Reporting Period coverage that may be available pursuant to paragraph 2 above; and

(c) such individual INSURED requests the Extended Reporting Period coverage and pays the appropriate premium within 120 days of the termination of coverage.

The premium charge for coverage to such an individual INSURED shall be commensurate with such coverage. The Company shall have no obligation to provide notice to any individual INSURED of the availability of the additional Extended Reporting Period coverage pursuant to this paragraph.

8. The offer of a renewal Policy with an increase in premium shall not be deemed a change in coverage less favorable to the INSURED.

All other terms and conditions remain unchanged.

Endorsement effective    2/01/08      Policy No.    U708-30155

Endorsement No.        7

by_____
(Authorized Representative)

NP0091

# *Endorsement*

ORGANIZATION: RICHMOND COUNTY COUNTRY CLUB

### ADDENDUM TO APPLICATION AND DECLARATIONS FOR NEW YORK INSUREDS

This notice is not part of the Policy. It merely describes some of the major features of the Policy. READ YOUR POLICY CAREFULLY to determine your rights, duties and what is and is not covered. Only the provisions of your Policy determine the scope of your insurance protection.

This Policy is issued on a "Claims-Made" basis. The Policy covers only Claims first made against those insured during the Policy Period or any Extended Reporting Period.

A Claim is considered first made when the Insured receives written notice of the Claim. However, if the Insurer receives written notice that a Wrongful Act has occured which may give rise to a Claim, then any Claim which is subsequently made against an Insured based upon such Wrongful Act will be considered first made at the time notice of the Wrongful Act was given to the Insurer. The Insurer must receive notice of a Wrongful Act which may give rise to a Claim during the Policy Period or during the Extended Reporting Period, if purchased. The Insurer must receive written notice of a Claim as soon as practicable.

All coverage under the Policy ceases upon termination of the Policy except for coverage which is afforded or that may be purchased by you under an Extended Reporting Period, as decribed below.

### SPECIAL "CLAIMS-MADE" PROVISIONS

Certain concepts relating to continuity of coverage under the "Claims-Made" Policy and the pertinent Policy provisions are especially important to understand. These include the retroactive date, if any, and the Extended Reporting Period, if selected.

RETROACTIVE DATE: A retroactive date may be entered on the Declarations page of the Policy or by endorsement. The Policy provides no coverage for Claims arising out of incidents, occurrences or Wrongful Acts which took place prior to the retroactive date even if the Claim is first made during the Policy Period. The retroactive date will not be changed by the Insurer or the Insured

EXTENDED REPORTING PERIOD OR "TAIL": When applicable, the Extended Reporting Period provisions of the Policy will extend the time within which a Claim may be subject to coverage under the Policy. The length of time of the Extended Reporting Period may vary from sixty days, in the case of the Automatic Extended Reporting Period, to one year or more in the case of the Optional Extended Reporting Period. Depending upon the length of the Extended Reporting Period and the coverage afforded by any subsequent insurer, potential coverage gaps may arise in connection with such Extended Reporting Period coverage. We urge you to read those particular provisions of your Policy carefully to be certain that you understand exactly what coverage you have under those provisions.

# *Endorsement*

The premium, if any, for the additional Extended Reporting Period coverage will be based on the percentage indicated in the Policy Declarations as applied to your last annual Policy premium.

The Extended Reporting period is also referred to in the insurance industry as "tail coverage". A Claim first received in writing and recorded during a "tail" period is considered made on the last day of the expiring or terminated Policy Period. "Tail coverage" will only apply if your "Claims-Made" Policy is cancelled or not renewed by you or the Insurer. The coverage is also available for any change change in coverage less favorable to you at renewal.

"CLAIMS-MADE" RATING: The rates for "Claims-Made" policies are comparatively lower than those that would be applicable to "occurrence" policies. The rates for a "Claims-Made" policy reflect an incremental rating basis which provides increasing rates during the first several years from the retroactive date or inception of the first "Claims-Made" policy. These incremental rates are independent of overall rate level increases.

All other terms and conditions remain unchanged.

Endorsement effective    2/01/08       Policy No.    U708-30155

Endorsement No.      8

by_____
                    (Authorized Representative)

NP0092

**Endorsement**

NAMED ORGANIZATION: RICHMOND COUNTY COUNTRY CLUB

Your policy contains coverage for certain losses caused by terrorism. We are required to notify you of the portion of the premium, if any, attributable to the coverage for terrorist acts certified under the Terrorism Risk Insurance Act of 2002. The Act also requires us to provide disclosure of Federal participation in payment of terrorism losses. For a further description of an act of terrorism as provided under the Act, see below.

You should know that effective November 26, 2002 any losses caused by certified acts of terrorism would be partially reimbursed by the United States government, Department of Treasury, under a formula established by federal law. Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The premium charged for this coverage is shown below; it does not include any charges for the portion of loss covered by the federal government under the Act.

The portion of your premium that is attributable to coverage for terrorist acts certified under the Act is $ -0-.

The following excerpt from the Act is provided for your information:

According to section 102(1) of the Terrorism Risk Insurance Act of 2002: "The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States---(1) to be an act of terrorism; (ii) to be a violent act or an act that is dangerous to (I) human life; (II) property; or (III) infrastructure; (iii) to have resulted in damage within the United States, or premises of a United States Mission; and (iv) to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion." Section 102(1)(B) states: "No act shall be certified by the Secretary as an act of terrorism if (i) the act is committed as part of the course of war declared by the Congress, except that this clause shall not apply with respect to any coverage for workers' compensation; or (ii) property and casualty insurance losses resulting from the act, in the aggregate, do not exceed $5,000,000." Section 102(C) and (D) specify that the determination are final and not subject to judicial review and that the Secretary of the Treasury cannot delegate the determination to anyone.

All other terms and conditions remain unchanged.

Endorsement effective:  2/01/08          Policy No.: U708-30155

Endorsement No.:     9

Professional Indemnity Agency, Inc.

by: _____
(Authorized Representative)

NP0094

# *Endorsement*

ORGANIZATION: RICHMOND COUNTY COUNTRY CLUB

## IMMIGRATION COVERAGE EXTENSION/SUBLIMIT ENDORSEMENT

In consideration of the premium charged it is hereby understood and agreed that a sublimit of liability in the amount of $50,000 in the aggregate  shall apply to any civil penalties or fines imposed upon the INSURED pursuant to the Federal Immigration and Nationality Act, including 8 U.S.C. Section 1324a (Unlawful Employment of Aliens), or other Federal immigration law for any actual or alleged violation of Federal law as a result of the employment, hiring and/or retention by the INSURED of unauthorized aliens. This sublimit of liability is part of and not in addition to the Limit of Liability stated in item 4 of the Declarations Page of the Policy. Notwithstanding the foregoing, this extension of coverage shall not apply to any fines or penalties if such are deemed to be uninsurable pursuant to the law under which this Policy shall be interpreted.

It is further understood and agreed that we shall have the option, but not the duty, to defend any criminal proceedings brought against any INSURED based upon, arising out of or involving any actual or alleged violation of the Federal Immigration and Nationality Act or other Federal immigration law arising from the employment and/or hiring/ retention by the INSURED of unauthorized aliens. Should we, at our sole discretion exercise the option to defend any such criminal proceeding, any DEFENSE COSTS incurred therein shall reduce and may exhaust the applicable Limit of Liability stated in item 4 of the Declarations Page of the Policy. The exercise of the option to defend any such criminal proceeding shall not serve to render us liable for any other LOSS incurred in connection with any criminal proceedings, and we retain the right to withdraw from the defense upon notice to you.

Solely for purposes of this Endorsement, SECTION III. DEFINITIONS, subparagraph B, shall be deleted in its entirety and replaced by the following:

III. DEFINITIONS

B. DEFENSE COSTS means fees and expenses incurred in defending, investigating, or appealing a CLAIM insured herein. DEFENSE COSTS shall not include fees and expenses incurred with regard to any salary charges or regular employees or officials of the Company nor salary or wages of the INSURED.

# *Endorsement*

Solely for purpose of this Endorsement, SECTION V. EXCLUSIONS, subparagraph E. shall be deleted in its entirety and replaced with the following:

V.   EXCLUSIONS

    E. based on any WRONGFUL ACT, which is, or alleged to be, an assault and/or battery, or any conduct which is dishonest, willful, malicious, fraudulent or otherwise intended to cause damage or injury to persons or property. However, not withstanding the foregoing, the INSUREDS shall be protected under the terms of this Policy as to any CLAIMS made against them by reason of any alleged dishonesty on the part of the INSUREDS unless a judgment or other final adjudication thereof adverse to such INSUREDS shall establish that acts of active deliberate dishonesty committed by such INSUREDS were material to the cause of action so adjudicated.

All other terms and conditions remain unchanged.

Endorsement effective      2/01/08        Policy No.   U708-30155

Endorsement No.     10

                       by_____
                          (Authorized Representative)

NP0137

# NON-PROFIT ORGANIZATION LIABILITY INSURANCE
### (THIS IS A CLAIMS MADE POLICY)

THIS POLICY IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD.  DEFENSE COSTS REDUCE THE LIMIT OF LIABILITY PROVIDED.  PLEASE REVIEW THIS POLICY CAREFULLY WITH YOUR INSURANCE BROKER OR ADVISOR.

In consideration of the payment of the premium, the undertaking of the **INSURED** to pay the deductible herein and in reliance upon all statements made and information in the application, which is attached hereto and made a part of this Policy, and subject to all the terms and conditions of this Policy, the Company agrees with the **INSURED** as follows:

## I.  INSURING AGREEMENT

The Company shall pay on behalf of the **INSURED** all **LOSS** and **DEFENSE COSTS** that the **INSURED** becomes legally obligated to pay solely because of a **CLAIM** first made against the **INSURED** during the **POLICY PERIOD**, or the Extended Reporting Period if in effect, for a **WRONGFUL ACT** committed or allegedly committed by the **INSURED.**

## II.  DEFENSE, INVESTIGATION AND SETTLEMENT OF CLAIMS

As respects such insurance as is afforded by this Policy, the Company shall have the right and duty to defend, including the selection of counsel, any **CLAIM** against the **INSURED** seeking damages for **LOSS**, even if any of the allegations are groundless, false or fraudulent.  The Company shall have the right to make such investigation, negotiation and settlement of any **CLAIM** as it deems appropriate, subject to the rights of the **INSURED** as set forth in Clause VII(G)(1).

## III.  DEFINITIONS

A.  **CLAIM** means:

1.  a written demand for monetary relief; or

2.  a civil, arbitration, regulatory or administrative proceeding for monetary relief or non-monetary relief which is commenced by:

a.  service of a complaint or similar pleading;

b.  demand for arbitration or similar document; or

c.  receipt of notice of charges or similar document.

B.  **DEFENSE COSTS** means fees and expenses incurred in defending, investigating, or appealing a **CLAIM** insured herein.  **DEFENSE COSTS** shall not include fees and expenses incurred with respect to any criminal action or proceeding, or with regard to any salary charges of regular employees or officials of the Company nor salary or wages of the **INSURED**.

C.  **INSURED** means the **ORGANIZATION** set forth in Item 1 of the Declarations, and any past, present or future duly elected or appointed Directors, Officers, Trustees, Employees, Volunteers or Committee Members of the **ORGANIZATION** in their capacity as such, or the estates, heirs, legal representatives or assigns of such persons who are deceased or incompetent, and

1.  Any non-profit subsidiary created during the **POLICY PERIOD**;

2. Any non-profit subsidiary acquired subsequent to the inception date of this Policy, but only for a period of 180 days from the date of acquisition or up to the end of the **POLICY PERIOD**, whichever is less. If coverage is desired beyond the foregoing term, the **ORGANIZATION** must make a specific written application to the Company requesting coverage for this subsidiary;

3. If the Company agrees to provide such coverage under Clause VII(B), any for-profit subsidiary created or acquired during the **POLICY PERIOD**; and

4. The spouses of any past, present, or future duly elected or appointed Directors, Officers, Trustees, Employees, Volunteers or Committee Members of the **ORGANIZATION**, or the estates, heirs, legal representatives, or assigns of such persons, but only to the extent that **CLAIMS** are asserted against such spouses arising solely out of any actual or alleged **WRONGFUL ACT** of the spouse who is insured under this definition.

D. **LOSS** means the amount paid by the Company on behalf of the **INSURED** for damages, judgements, and settlements with respect to **CLAIMS** for which coverage hereunder applies. **LOSS** shall not include any amount which the **INSURED** is not legally obligated to pay. **LOSS** also shall not include any civil or criminal fines, penalties, sanctions or taxes, any punitive or exemplary damages or the multiplied portion of any multiplied damage award, or any matters which may be deemed uninsurable under the law pursuant to which this insurance shall be construed.

E. **ORGANIZATION** means the Non-Profit Organization named in Item 1 of the Declarations and any subsidiary, listed in the written application for coverage as of the inception date of this Policy, that has been accepted by the Company.

F. **PERSONAL INJURY** means any actual or alleged:

   1. false arrest, wrongful detention or imprisonment or malicious prosecution;

   2. libel, slander, defamation of character or invasion of privacy;

   3. wrongful entry, eviction or other invasion of the right of privacy;

   4. infringement of copyright or trademark or other unauthorized use of title; or

   5. plagiarism or misappropriation of ideas.

G. **POLICY PERIOD** means the period from the inception date stated in Item 3 of the Declarations to the expiration date or earlier date of termination of this Policy.

H. **THIRD-PARTY DISCRIMINATION** means any actual or alleged discrimination or sexual harassment of a client, customer or vendor of, or visitor to, the **ORGANIZATION**, or violation of that person's civil rights relating to such discrimination or sexual harassment.

I. **WRONGFUL ACT** means any error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted or allegedly committed or attempted, by any **INSURED**, individually or otherwise, in an **INSURED** capacity, including **WRONGFUL EMPLOYMENT PRACTICES**, **PERSONAL INJURY** or **THIRD PARTY DISCRIMINATION.**

J. **WRONGFUL EMPLOYMENT PRACTICES** means any actual or alleged:

   1. wrongful dismissal or discharge or termination of employment whether actual or constructive;

   2. employment related misrepresentations;

   3. violation of any federal, state or local law concerning employment or discrimination in employment, including but not limited to, the Americans with Disabilities Act of 1992, the Civil Rights Act of 1991, the Age

Discrimination in Employment Act of 1967, Title VII of the Civil Rights Act of 1964 (as amended), the Pregnancy Discrimination Act of 1978, the Civil Rights Act of 1866, the Family Medical Leave Act of 1993, the Older Workers Benefit Protection Act of 1990, the Fifth and Fourteenth Amendments of the United States Constitution, or any rule or regulation promulgated thereunder;

4. sexual or other harassment in the workplace;

5. wrongful deprivation of career opportunity, employment or promotion; or

6. wrongful hiring, retention, discipline or evaluation or failure to adopt adequate employment or workplace policies and procedure.

## IV.    TERRITORY

This Policy applies to **WRONGFUL ACTS** committed by an **INSURED** anywhere in the world, provided that the **CLAIM** is made against the **INSURED** in the United States of America, its territories or possessions, or Canada.

## V.    EXCLUSIONS

This Policy does not apply to any **CLAIM**:

A. based on or involving facts or circumstances which at the original inception date of this Policy, any **INSURED** had a reasonable basis to believe such facts and circumstances might lead to a **CLAIM** against any **INSURED**. Knowledge possessed by any one **INSURED** shall not be imputed to any other **INSURED** for the purpose of determining the application of this exclusion. The term "original inception date" shall mean the date when continuous coverage was first issued to the **INSURED** through Professional Indemnity Agency, Inc.;

B. based on or involving facts or circumstances about which an **INSURED** has provided notice to any prior insurer;

C. based on or involving bodily injury to, or sickness, disease, death or emotional distress of any person, or loss of use of, damage to or destruction of any tangible property. To the extent a **CLAIM** is made for **WRONGFUL EMPLOYMENT PRACTICES** or **THIRD PARTY DISCRIMINATION**, emotional distress is deleted from this exclusion;

D. based on or involving seepage, pollution or contamination of any kind;

E. based on any **WRONGFUL ACT**, which is, or alleged to be, an assault and/or battery, a willful or reckless violation of any statute, or any conduct which is dishonest, willful, malicious, fraudulent or otherwise intended to cause damage or injury to persons or property. However, not withstanding the foregoing, the **INSUREDS** shall be protected under the terms of this Policy as to any **CLAIMS** made against them by reason of any alleged dishonesty on the part of the **INSUREDS** unless a judgement or other final adjudication thereof adverse to such **INSUREDS** shall establish that acts of active deliberate dishonesty committed by such **INSUREDS** were material to the cause of action so adjudicated;

F. based on an actual or alleged violation of the Employee Retirement Income Security Act of 1974 and any amendments thereto or similar provisions of any federal, state or local statutory law or common law;

G. which are brought by or on behalf of the **ORGANIZATION** or any entity which is controlled by, controls or is under common control with the **ORGANIZATION** or brought by or on behalf of any **INSURED**; however, this exclusion shall not apply to **CLAIMS** for **WRONGFUL EMPLOYMENT PRACTICES** brought by a present or former Employee;

H. based on any actual or alleged breach of contract or agreement, express or implied, written or oral; however, this exclusion shall not apply to any **CLAIM** for breach of contract to provide services for which the **ORGANIZATION** is chartered or **CLAIMS** for **WRONGFUL EMPLOYMENT PRACTICES** if liability would have attached to the **ORGANIZATION** in the absence of any express contract or agreement which is the subject of such **CLAIM**. 

I.  For or relating to the cost of providing any of the reasonable accommodations required by, or made as a result of, the Americans with Disabilities Act of 1992.

## VI.   WAIVER OF EXCLUSION AND CONDITIONS

Whenever coverage under any provision of this Policy would be excluded, suspended or lost:

A.  because of Exclusion E relating to a dishonest, willful, malicious or fraudulent act, or a willful or reckless violation of any statute, by an **INSURED** and with respect to which any other **INSURED** did not personally participate or personally acquiesce or remain passive after having personal knowledge thereof, or

B.  because of noncompliance with any condition relating to giving of notice to the Company with respect to which any other **INSURED** shall be in default, solely because the default or concealment of the default by any other **INSURED** responsible for the **LOSS** or damage otherwise insured hereunder,

the Company agrees that such insurance as would otherwise be afforded under this Policy shall continue in effect, cover and be paid with respect to each and every **INSURED** who did not personally commit or personally participate in committing or personally acquiesce in or remain passive after having personal knowledge of one or more of the acts or omissions described in any such exclusion or condition; provided that if the condition be one with which such **INSURED** can comply, after receiving knowledge thereof, the **INSURED** entitled to the benefit of this Waiver of Exclusion and Conditions shall comply with such condition promptly after obtaining knowledge of another **INSURED** to comply therewith.   If the **INSURED** does not comply with the condition promptly after obtaining knowledge of the failure of another **INSURED** to comply, then the provisions of this Clause VI. shall not apply and no waiver of exclusions and conditions shall be afforded to such **INSURED**.

## VII.   OTHER CONDITIONS AND AGREEMENTS

A.  LIMIT OF LIABILITY, DEDUCTIBLE AND OTHER INSURANCE:

1.  The Company's obligation to pay **LOSS** and **DEFENSE COSTS** because of all **CLAIMS** first made against the **INSURED** during the **POLICY PERIOD** is subject to and shall never exceed the amount of the Company's Limit of Liability stated in Item 4 of the Declarations.  Any payment of **LOSS** and/or **DEFENSE COSTS** by the Company will reduce the stated Limit of Liability.  Once the Limit of Liability is exhausted by such payments, the Company will have no further obligations under this Policy to pay **LOSS** or **DEFENSE COSTS**.

2.  The Company shall only be liable to pay, subject to the Limit of Liability, for **LOSS** and/or **DEFENSE COSTS** in excess of the deductible stated in Item 5 of the Declarations.  The deductible applies to **LOSS** and **DEFENSE COSTS** with respect to each **CLAIM** insured.

3.  This insurance is excess of any other valid and collectible insurance available to the **INSURED**, whether such insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as a specific excess insurance over the Limit of Liability stated in Item 4 of the Declarations of this Policy.

B.  ADJUSTMENTS:

If after the Inception Date stated in Item 3 of the Declarations, the **ORGANIZATION** acquires or assumes all or substantially all of the equity, assets or liabilities of, or merges with, any for-profit entity or creates a for-profit subsidiary, there shall be no coverage under this Policy for **LOSS** or **DEFENSE COSTS** in connection with any **CLAIM** for **WRONGFUL ACTS** arising out of or in any way relating to the for-profit entity, or the equity, assets or liabilities acquired, assumed, merged with or created thereby, unless

1.  the Company receives from the **ORGANIZATION** full details of such transaction or event, and

2.  the Company, at its sole discretion, agrees by written endorsement to this Policy to provide coverage to the for-profit entity upon such terms, conditions and limitations as the Company may require.

Page 4 of 7

C.  INTERRELATED ACTS:

A **CLAIM** or **CLAIMS** by one or more claimants made against one or more **INSUREDS** which arise out of the same **WRONGFUL ACT** or interrelated **WRONGFUL ACTS** shall be deemed to be a single **CLAIM** and shall be deemed to have been made when the first of such **CLAIMS** is made. Any interrelated **WRONGFUL ACTS** shall be deemed to have been committed when the first of any such **WRONGFUL ACTS** was committed.

D.  REPORTING OF **WRONGFUL ACTS:**

If during the **POLICY PERIOD** or the Extended Reporting Period, if in effect, the **INSURED** first becomes aware of any specific and identifiable **WRONGFUL ACT** which could give rise to a **CLAIM** and written notice of such **WRONGFUL ACT** is given to the Company, including the circumstances by which the **INSURED** first became aware of such **WRONGFUL ACT**, then any **CLAIM** that is subsequently made against the **INSURED** arising out of such **WRONGFUL ACT** shall be deemed for the purpose of this Policy to have been made against the **INSURED** during the **POLICY PERIOD**. The **INSURED** shall not have the right to report any **WRONGFUL ACT** to the Company if such takes place or commences subsequent to the expiration date or earlier date of termination of the Policy. The **INSURED** shall cooperate with and assist the Company and its representatives in the investigation of any **WRONGFUL ACT** reported under this Clause VII(D).

E.  EXTENDED REPORTING PERIOD OPTION:

If the Company or the **ORGANIZATION** shall cancel or refuse to renew this Policy, the **ORGANIZATION** shall have the right, upon payment of an additional premium of seventy-five (75) percent of the annual premium stated in Item 6 of the Declarations, to an additional period of twelve (12) months following the effective date of such cancellation or the expiration date of the Policy in which to give written notice of **CLAIMS** first made against the **INSURED** during the Extended Reporting Period, but only in respect of any **WRONGFUL ACT** committed or allegedly committed prior to the effective date of such cancellation or expiration date of the Policy and subsequent to the Prior Acts Exclusion Date, if any. This right of extension shall terminate unless written notice of such election is received by the Company within ten (10) days of the effective date of cancellation or the expiration date of the Policy. For purposes of the Limit of Liability, the Extended Reporting Period shall be deemed part of the **POLICY PERIOD** and not in addition thereto, and shall not change or enlarge the Company's limit of Liability. This clause and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

F.  NOTICE:

As a condition precedent to the **INSURED'S** right to coverage under this Policy, the **INSURED** shall:

1.  give written notice to the Company as soon as practicable of any **CLAIM** made against the **INSURED**, and at their own expense, cooperate with and assist the Company and its Representatives, as the Company may require, in the settlement, defense, appeal and/or investigation of such **CLAIM**;

2.  Immediately notify the Company of any complaint, demand for arbitration or notice of charges served upon the **INSURED** and provide the Company with copies of all such documents;

With regard to Paragraph 1 above, knowledge of a **CLAIM** possessed by one **INSURED** shall not be imputed to any other **INSURED**;

Any notice to the Company under this Clause VII(F) shall be given to Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, 150 East 42nd Street, New York, New York 10017.

Page 5 of 7

G.  SETTLEMENT OF **CLAIM**:

1.  The Company shall not settle or satisfy any **CLAIM** without the consent of the **INSURED**. If the **INSURED** elects not to settle or satisfy a **CLAIM** as recommended by the Company and acceptable to the claimant, then subject to the Limit of Liability of this Policy, the Company will not be liable for any **LOSS** in excess of the amount of the recommended settlement, or for any **DEFENSE COSTS** incurred after the date of the **INSURED'S** election not to settle or satisfy a **CLAIM** as recommended by the Company. In no event shall the Company be liable in excess of the available Limit of Liability.

2.  The **INSURED** shall not assume or admit liability for, or pay, settle or satisfy any **CLAIM**, either as to **LOSS** or **DEFENSE COSTS**, without the Company's prior written consent, except at the **INSURED'S** own expense.

H.  CANCELLATION:

1.  This Policy may be cancelled by the **ORGANIZATION** at any time by written notice to the Company stating when thereafter the cancellation shall be effective or by surrender of this Policy to the Company.

2.  This Policy may also be cancelled by or on behalf of the Company by delivering to the **INSUREDS'** representative designated in the application, or by mailing to the **INSUREDS'** representative by registered, certified, or other first-class mail, written notice stating when, not less than thirty (30) days thereafter (or ten (10) days in the event of non-payment of premium), the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice and this Policy shall terminate at the date and hour specified in such notice.

3.  If this Policy shall be cancelled by the Company, the Company shall retain the customary pro rata earned premium.

4.  If this Policy shall be cancelled by the **ORGANIZATION**, the Company shall retain the customary short rate earned premium.

5.  Payment or tender of any unearned premium by the Company shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable. If the period of limitation relating to the giving of notice of cancellation is prohibited or made void by any law controlling the construction thereof, such period shall be amended so as to be equal to the minimum period of limitations permitted by any such law.

6.  For the purpose of this Policy, notice of cancellation given to the **INSUREDS'** representative pursuant to this paragraph shall be deemed to be notice to all **INSUREDS**.

I.  REPRESENTATIONS AND SEVERABILITY:

The Company, in issuing this Policy, has relied upon the declarations and statements contained in the written application for coverage and the documents attached thereto. All the declarations, statements and documents are the basis of coverage, and shall be considered incorporated in and constituting part of the Policy. The written application for coverage shall be construed as a separate application by each **INSURED**. With respect to the declarations, statements and documents contained in the written application for coverage, no statement or knowledge possessed by an **INSURED** shall be imputed to any other **INSURED** in determining whether coverage is available for any **CLAIM** made against an **INSURED**.

J. ACTION AGAINST THE COMPANY:

No action shall lie against the Company unless, as a condition precedent thereto, the **INSURED** shall have fully complied with all the terms of this Policy, nor until the amount of the **INSURED'S** obligation to pay shall have finally determined either by judgement against the **INSURED** after actual trial, or by written agreement of the **INSURED**, the claimant and the Company.

Any person or **ORGANIZATION** or the legal representative thereof who has secured such judgement or written agreement shall thereafter be entitled to recover under this Policy to the extent of the insurance afforded by this Policy. No person or **ORGANIZATION** shall have any right under this Policy to join the Company as a party to any action against the **INSURED** to determine the **INSURED'S** liability, nor shall the Company be impleaded by the **INSURED** or his legal representative. Bankruptcy or insolvency of the **INSURED** or of the **INSURED'S** estate shall not relieve the Company of any of its obligations hereunder.

K. ASSIGNMENT:

Assignment of interest under this Policy shall not bind the Company without its written consent.

L. SUBROGATION:

In the event of any **CLAIM** or payment under this Policy, the Company shall be subrogated to the extent of such payment to all rights of recovery therefor, and the **INSURED** shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Company effectively to bring suit in the name of the **INSURED**. The **INSURED** shall do nothing after **CLAIM** is made against them to prejudice such rights. Any recovery shall be first paid to the Company to the extent of any **LOSS** paid by the Company with the balance paid to the **INSURED**.

M. ENTIRE AGREEMENT:

By acceptance of the Policy, the **INSURED** and the Company agree that this Policy embodies all agreements existing between them or any of their representatives relating to this insurance.

N. NOTICE TO INSUREDS:

All **INSUREDS** appoint the person designated in the application, at the address of the **ORGANIZATION** stated in Item 2 of the Declarations, as their representative to receive any notice or communication from the Company.

O. CHANGES:

Notice to or knowledge possessed by any agent of the Company shall not effect a waiver or a change in any part of this Policy nor estop the Company from asserting any rights under the terms of this Policy. The terms of this Policy cannot be waived or changed, except by endorsement issued to form a part of this Policy, signed by an authorized representative of the Company.



**PHILADELPHIA**
INSURANCE COMPANIES

One Bala Plaza, Suite 100
Bala Cynwyd. PA 19004

### FLEXI PLUS FIVE RENEWAL APPLICATION
NOT-FOR-PROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY INSURANCE
EMPLOYMENT PRACTICES LIABILITY INSURANCE
FIDUCIARY LIABILITY INSURANCE
WORKPLACE VIOLENCE COVERAGE
INTERNET LIABILITY INSURANCE

THIS IS AN APPLICATION FOR A CLAIMS MADE POLICY
PLEASE READ YOUR POLICY CAREFULLY

### Instructions:
- Whenever used in this Application the term **Applicant** shall mean the Parent Organization and its wholly-owned/controlled subsidiaries.
- The **Applicant** is required to complete Sections 1, 2, and 7.
- The **Applicant** should complete other applicable Section(s) for which coverage is desired. (See chart below)
- Please include all requested underwriting information and attachments.  Failure to supply may result in delay.

| Check Coverage Desired | Section | Requested Limit | Requested Retention |
|---|---|---|---|
| ☐General Information | 1 | N/A | N/A |
| ☐Directors & Officers | 2 | $ | $ |
| ☐Employment Practices | 3 | $ | $ |
| ☐Fiduciary Liability | 4 | $ 1,000,000 | $ ———— |
| ☐Workplace Violence | 5 | $ | $ |
| ☐Internet Liability | 6 | $ | $ |
| ☐General Summary | 7 | N/A | N/A |

### SECTION 1 – GENERAL INFORMATION
(All Applicants **must** complete this Section)

1. Name of Parent Organization: Richmond County Country Club

2. Change in Address:☐None or  Change in internet address:☐  None or
135 Flagg Place, Staten Island, NY  10304
www. _____

Billing contact name: _____

3. Has there been any changes in the **Applicant's** operations?☐Yes ☑No  If yes, please provide details.

4. Does the **Applicant** have a tax-exempt status under the U.S. Internal Revenue Code?☑Yes☐ No
   **If no, provide an explanation.**

5. The Officer of the **Applicant** designated to receive any and all notices from the **Underwriter** or their authorized representative concerning this insurance is:

| Name | Title | E-mail Address |
|---|---|---|

**FINANCIAL INFORMATION**          CURRENT FISCAL YEAR          PREVIOUS FISCAL YEAR

TOTAL ASSETS:                    $ _11,435,189_                $ _____

NET ASSETS / FUND BALANCE:       $ _____           $ _____

ANNUAL REVENUE:                  $ _8,211,282_                 $ _____

NET REVENUE                      $ _____           $ _____

**Please attach the most recent annual financial audit or 990 tax form.**

### SECTION 2 – DIRECTORS AND OFFICERS
### (All Applicants must complete this Section)

1. In the past twelve (12) months or the next twelve (12) months, has the Applicant been or anticipate being involved in ay of the following? **If yes attach details.**

Creation of any new subsidiaries?                                                    ☐Yes ☐No

Mergers, acquisitions or consolidation with another entity?                          ☐Yes ☐No

Changes in the board of directors or senior management (other than death or retirement)?   ☐Yes ☐No

### SECTION 3 – EMPLOYMENT PRACTICES
### (Complete this section only if Employment Practices Liability coverage is desired.)

1. Please provide the following employee count information:

| U.S. based employees/volunteers: | Currently | One Year Ago | Two Years Ago |
|---|---|---|---|
| Full Time employees: | | | |
| Part Time employees: | | | |
| Temporary employees: | | | |
| Volunteers: | | | |
| **Non U.S. based employees/volunteers:** | | | |
| **TOTAL SUM OF ABOVE** | | | |

2. How many employees have been terminated or demoted in the past twelve (12) months?

Voluntary: _____  Involuntary: _____  Laid Off: _____     Demoted: _____

3. Is any reduction of employees or change of status anticipated in the next year?

Voluntary: _____  Involuntary: _____  Lay Offs: _____     Demotions: _____

4. Has the Applicant implemented any new employment practice/human resource policies or procedures?
☐ Yes ☐ No **If yes, please provide details.**

## SECTION 4 – FIDUCIARY LIABILITY
**(Complete this section only if Fiduciary liability coverage is desired.)**

1. List all plans for which coverage is requested (use attachment if necessary):

| Plan Name | Year Established | Assets/ Contributions | Type* | Participants | Administrator |
|---|---|---|---|---|---|
| **Example:** The ABC Children Corp 401K Plan | 2000 | $1,000,000 | 2 | 75 | self |
| a) _Cecc   401K Plan_ | _2000_ | _35,000_ | _2_ | _10_ | _self_ |
| b) | | | | | |
| c) | | | | | |
| d) | | | | | |

**Please attach a separate page or use the additional information page provided at the end of the application.**

* 1=Employee Welfare Benefit Plan (as defined by ERISA), 2= Defined Contribution Plan (as defined by ERISA), 3= Defined Benefit Plan (as defined by ERISA), 4=Other. **If Type is 3 or 4 a Fiduciary Liability Supplemental Application must be completed.**

2. Have there been any changes to any plan listed above? ☐ Yes ☑ No  **If yes, please attach details.**

3. Has any plan requested or contemplated filing a request for termination? ☐ Yes ☑ No **If yes, please attach details.**

4. Has any plan been spun-off (sold), transferred or terminated?  ☐ Yes ☑ No  **If yes, please attach details.**
**Please attach a Form 5500 for each plan listed above.**

## SECTION 5 – WORKPLACE VIOLENCE
**(Complete this section only if Workplace Violence coverage is desired.)**

1. Has the **Applicant** added additional work locations? ☐ Yes ☐ No  **If yes, please attach details.**

2. The **Applicant's** total number of employees:

3. Has the Applicant implemented any new employment procedures, office procedures, or security procedures?
☐ Yes ☐ No **If yes, please attach details.**

4. In the past twelve (12) months or in the next twelve (12) months, has the **Applicant** been involved with or anticipate any layoffs, staff reductions, or facility closings? ☐ Yes ☐ No **If yes, please attach details.**

## SECTION 6 – INTERNET LIABILITY
**(Complete this section only if Internet Liability coverage is desired.)**

1. Has the **Applicant** created any new websites? ☐ Yes ☐ No  **If yes please provide the site address(es)?**

2. Has the **Applicant** made any material changes to the existing site? ☐ Yes ☐ No  **If yes, please provide details.**

## SECTION 7 – GENERAL SUMMARY
### (All Applicants **must** complete this Section.)

1. Has the **Applicant** been the subject or involved in any litigation in the past twelve (12) month? ☐ Yes ☑No
If yes, please complete a supplemental claim form.

2. In the next twelve (12) months, does the Applicant anticipate any substantial change or reorganization of operations? ☐ Yes ☑No  If yes, please provide details.

---

If there is any material change to the answers of the Application's questions prior to the policy inception date, the Applicant must notify the Underwriter in writing. Any outstanding quotation may be modified or withdrawn.

False Information

> **WARNING:** ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

**NOTICE TO NEW YORK APPLICANTS:**  ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION.

**NOTICE TO KENTUCKY APPLICANTS:**  ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT WHICH IS A CRIME.

**NOTICE TO MINNESOTA AND OHIO APPLICANTS:**  ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD, WHICH IS A CRIME.

**NOTICE TO OKLAHOMA APPLICANTS:**  ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKE ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY.

**NOTICE TO PENNSYLVANIA APPLICANTS:**  ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

**NOTICE TO FLORIDA APPLICANTS:**  ANY PERSON WHO, KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY EMPLOYER OR EMPLOYEE, INSURANCE COMPANY, OR SELF-INSURED PROGRAM, FILES A STATEMENT OF CLAIM CONTAINING ANY FALSE OR MISLEADING INFORMATION IS GUILTY OF A FELONY OF THE THIRD DEGREE.

**NOTICE TO NEW JERSEY APPLICANTS:** ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES.

**NOTICE TO DISTRICT OF COLUMBIA, MAINE AND VIRGINIA APPLICANTS:** IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, OR A DENIAL OF INSURANCE BENEFITS.

**NOTICE TO NEW MEXICO APPLICANTS:** ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES.

**NOTICE TO MARYLAND APPLICANTS:** ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT MAY BE GUILTY OF INSURANCE FRAUD.

**NOTICE TO OREGON AND TEXAS APPLICANTS:** ANY PERSON WHO MAKES AN INTENTIONAL MISSTATEMENT THAT IS MATERIAL TO THE RISK MAY BE FOUND GUILTY OF INSURANCE FRAUD BY A COURT OF LAW.

**NOTICE TO TENNESSEE APPLICANTS:** IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS.

Signature

The Undersigned warrants that to the best of his/her knowledge and belief the statements set forth herein are true. The Undersigned further declares that any occurrence or event that takes place prior to the effective date of the insurance applied for which may render inaccurate, untrue, or incomplete any statement made will immediately be reported in writing to the Underwriter. The Underwriter may withdraw or modify any outstanding quotations and/or authorization or agreement to bind the insurance. The Underwriter is hereby authorized to make any investigation and inquiry in connection with the information, statements and disclosures provided in this Application. The signing of this Application does not bind the Undersigned to purchase the insurance, nor does the review of this Application bind the insurance company to issue a policy. It is agreed that this Application shall be the basis of the contract should a policy be issued. This Application will be attached and become a part of the policy.

_____     _____
Name (Please Print)                 Title (**MUST BE SIGNED BY THE PRESIDENT, CHAIRMAN
                                    OR EXECUTIVE DIRECTOR**)

_____     _____
Signature                           Date

The above signed warrants that he/she is authorized and has the power to complete and execute this Application, including the Warranty Statement on behalf of the **Applicant** and their respective Directors, Officers or other insured persons.

Produced By: (Section to be completed by Agent/Broker)

Agent: _____ Agency: _____

Agency Taxpayer ID or SS No.: _____ Agent License No: _____

Address (Street, City, State, Zip) :

_____

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND

------------------------------------------------X

ROSE MARIE REILLY, MARYLOU REMINI,   Index No. 102479/08
NANCY FORD, ROSEANNE McCORMICK,
GABRIEL CINCU, BARBARA ALI,
ANNE MURPHY, A. ANTHONY OLIVETTI,
BRIANNA OLIVETTI, KAREN FRANCHI,   **COMPLAINT**
THOMAS J. BAROZ, JOHN CARAVELLA,
SUZANNE ALI and TAMARA DOHERTY,

*Plaintiffs,*

-against-

RICHMOND COUNTY COUNTRY CLUB,

*Defendant.*

------------------------------------------------X

Plaintiffs ROSE MARIE REILLY, MARYLOU REMINI,

NANCY FORD, ROSEANNE McCORMICK, GABRIEL CINCU,

BARBARA ALI, ANNE MURPHY, A. ANTHONY OLIVETTI,

BRIANNA OLIVETTI, KAREN FRANCHI, THOMAS J. BAROZ, JOHN

CARAVELLA, SUZANNE ALI and TAMARA DOHERTY ("Plaintiffs"),

by their attorneys, the Law Offices of Scott A. Lucas, allege as follows for

their Complaint against Defendant RICHMOND COUNTY COUNTRY

CLUB ("Defendant" or the "Country Club").

## INTRODUCTION

1.      RICHMOND COUNTY COUNTRY CLUB has an on-premises banquet facility where it adds an 18% or 20% service charge to the banquet bills in place of the traditional tip, but fails to distribute it to the Wait Staff.  Such conduct violates New York Labor Law § 196-d, which provides, in pertinent part:  "No employer...shall demand or accept, directly or indirectly, any part of a gratuity <u>or any charge purported to be a gratuity</u>..." (emphasis supplied).

2.      The Country Club's practice of violating Labor Law § 196-d year after year has been clear and calculated.  The Country Club not only failed to include any disclaimer warning patrons that the percentage-based service charge is *not* a tip substitute, it has deliberately reinforced the natural, reasonable and nearly-uniform understanding of patrons that the service charge *is* a tip substitute.

3.      Specifically, the Country Club, in its official and widely-circulated "Rules and Regulations," unequivocally describes the service charge as a tip substitute by declaring that *"Tipping...is not permitted since a service charge or gratuity of 18% is added to all charges for both food and beverage."*

2

4.     Plaintiffs are present and former Wait Staff employees of the Country Club.  They seek damages under Labor Law § 196-d and a 25% penalty and mandatory attorney's fees under Labor Law § 198, together with pre-judgment interest and the costs of this action.

## JURISDICTION & VENUE

5.     This Court has jurisdiction under, *inter alia*, New York CPLR article 3 (§ 301, *et seq.*) and New York Labor Law article 6 (§§ 196-d, 190, 193 and 198).

6.     Venue is proper under New York CPLR §§ 503 and 509.

7.     The Summons was personally served on Defendant on June 6, 2008, and Defendant thereafter timely served a Notice of Appearance and Demand for Complaint.

## THE PARTIES

### Plaintiffs

8.     Plaintiffs ROSE MARIE REILLY, MARYLOU REMINI, NANCY FORD, ROSEANNE McCORMICK, BARBARA ALI, ANNE MURPHY, A. ANTHONY OLIVETTI, BRIANNA OLIVETTI, KAREN FRANCII, SUZANNE ALI and TAMARA DOHERTY are

3

employees of Defendant who, at all material times herein, were employed by Defendant as banquet servers.

9.    Plaintiffs THOMAS J. BAROZ and JOHN CARAVELLA are or were employees of Defendant who, at all material times herein, were employed by Defendant as bartenders.

10.    Plaintiff Gabriel Cincu is an employee of Defendant who, at all material times herein, was employed by Defendant as, *inter alia*, Defendant's Maître d'.

11.    Plaintiff ROSE MARIE REILLY resides at 14 Benton Avenue in the County of Richmond and State of New York.

12.    Plaintiff MARYLOU REMINI resides at 2 Lincoln Avenue in the County of Richmond and State of New York.

13.    Plaintiff NANCY FORD resides at 184 Fingerboard Road in the County of Richmond and State of New York.

14.    Plaintiff ROSEANNE McCORMICK resides at 503 Neckar Avenue in the County of Richmond and State of New York.

15.    Plaintiff GABRIEL CINCU resides at 1119 67th Street in the County of Kings and State of New York.

16.    Plaintiff BARBARA ALI resides at 45 Lott Lane in the County of Richmond and State of New York.

4

17. Plaintiff ANNE MURPHY resides at 191 Livingston Avenue in the County of Richmond and State of New York.

18. Plaintiff A. ANTHONY OLIVETTI resides at 236 Morrison Avenue in the County of Richmond and State of New York.

19. Plaintiff BRIANNA OLIVETTI resides at 236 Morrison Avenue in the County of Richmond and State of New York.

20. Plaintiff KAREN FRANCHI resides at 73 Hooper Avenue in the County of Richmond and State of New York.

21. Plaintiff THOMAS J. BAROZ resides at 322 Gansevoort Boulevard in the County of Richmond and State of New York.

22. Plaintiff JOHN CARAVELLA resides at 4 Bailey Road, Matawan, New Jersey 07747.

23. Plaintiff SUZANNE ALI resides at 45 Lott Lane in the County of Richmond and State of New York.

24. Plaintiff TAMARA DOHERTY resides at 25 Edstone Drive in the County of Richmond and State of New York.

25. Plaintiffs' approximate dates of employment with Defendant are as follows:

(a) ROSE MARIE REILLY (from May 2006 to the present);

(b) MARYLOU REMINI (September 1996 to the present);

5

(c)   NANCY FORD (from May 1999 to the present);

(d)   ROSEANNE McCORMICK (from September 2004 to the present);

(e)   GABRIEL CINCU (from December 2004 to the present);

(f)   BARBARA ALI (from August 2002 to the present);

(g)   ANNE MURPHY (from September 1995 to the present);

(h)   A. ANTHONY OLIVETTI (from September 2007 to the present);

(i)   BRIANNA OLIVETTI (from December 2002 to the present)

(j)   KAREN FRANCHI (from October 2000 to the present);

(k)   THOMAS J. BAROZ (from 1996 through 2006);

(l)   JOHN CARAVELLA (from May 1999 to the present);

(m)   SUZANNE ALI (from May 2006 through November 2007 and from May 2008 to the present); and

(n)   TAMARA DOHERTY (from December 2005 to the present).

6

## Defendant

26.     Upon information and belief, RICHMOND COUNTY COUNTRY CLUB is a country club that purports to be a not-for-profit entity, and is located at 135 Flagg Place in the County of Richmond and State of New York.

## FACTS

27.     For large parties at restaurant and banquet establishments a percentage-based service charge is commonly added to the bill (often 18% or 20%) in place of the traditional tip.

28.     This practice of adding a service charge/automatic gratuity to the bill is a variant of the well-established practice of tipping.

29.     A bona fide service charge serves the convenience of the patron at a banquet because, *inter alia*, the tip is normally paid when the bill is presented, and since banquet bills are normally paid in advance it is generally convenient for the patron to pay a service charge at that time rather than initiating a separate payment transaction for the tip at the conclusion of the banquet.

30.     A bona fide service charge also protects the Wait Staff from spending an entire evening, or a large block of hours, working for one

7

set of common patrons, but not being adequately compensated due to, for example, an oversight by the party paying the bill.

31. When such a service charge is added to the bill, the patron (the party hosting the banquet) naturally understands it to be in place of a gratuity that would otherwise customarily be left for the Wait Staff at the end of the meal. As a consequence, the patron naturally believes that he or she is not expected to pay a separate gratuity directly to the server.

32. With tipping in this country having developed into an unwritten rule that commands greater adherence than most written rules, the practice of imposing service charges/automatic gratuities gained widespread acceptance, particularly in the banquet and group dining contexts, where patrons fully expect to pay a service charge/automatic gratuity in place of the tip.

33. A charge "purports" to be a gratuity if it would cause a reasonable patron to believe it is a tip substitute.

34. It is especially likely (indeed, almost certain) that a reasonable patron will believe a charge takes the place of the traditional tip if:

     (A)  it is a percentage-based charge;

8

    (B)    the percentage of the charge falls within the range of a customary tip for fine dining (*e.g.*, 18% or 20%);

    (C)    it is described as a charge for the "service"; and

    (D)    there is no disclaimer warning the patron that the percentage-based charge is *not* a tip substitute.

35.    While some patrons would prefer to retain discretion over how much the tip should be, few would ever entertain the thought that the restaurant or banquet operator might keep the service charge instead of distributing it to the direct service staff.

36.    Absent a clear and prominent disclaimer, reasonable banquet and restaurant patrons understand that a percentage-based service charge that approximates the percentage of a customary gratuity (18%-20%) is indeed a tip substitute, and will be distributed to the direct service staff.

37.    Defendant operates a banquet facility where it employs and employed Plaintiffs as Wait Staff employees.

38.    Consistent with the 18% "service charge" it adds to food and beverage charges for dining in the Country Club's patio and pool areas, the Country Club generally adds an 18% "service charge" to the bill, or to the food and beverage charges thereof, for member-held banquets (and a 20% service charge for non-member banquets).

9

39.    At all material times herein, Defendant failed to give its Wait Staff any portion of the service charge added to the cost of banquets and outdoor dining.

40.    The service charge added to the banquet bills and to the charges for outdoor dining is a "charge purported to be a gratuity" because it:

(A)    is percentage-based;

(B)    is within the range of a customary tip for fine dining (*i.e.*, 18% or 20%);

(C)    is described as a charge for the "service"; and

(D)    contains no disclaimer warning the patron that the percentage-based charge is *not* a tip substitute.

41.    The Country Club not only failed to include a disclaimer warning patrons that the percentage-based service charge is *not* a tip substitute, it has reinforced the natural, reasonable and nearly-uniform understanding of patrons that the service charge *is* a tip substitute by issuing "Rules and Regulations" to its members describing the service charge as a tip substitute.

10

42.    If the Country Club did not intend for its patrons to view the "service charge" a substitute for the traditional (discretionary) tip, then it would not have identified it as a tip substitute.

43.    If the Country Club wanted to legitimately charge higher prices, it would have simply adjusted its prices upward, or, at a minimum, it would have labeled the additional charge a "surcharge".

44.    Upon information and belief, the Country Club's members, who are predominantly wealthy, are generally interested in the well being of their own Club's Wait Staff.

45.    Upon information and belief, the Country Club's members would not wish or expect to compensate their own Club's Wait Staff (who they will likely encounter again on multiple occasions) less generously than they would compensate the wait staff of an out-of-town restaurant or banquet hall for providing comparable service.

46.    In addition, assuming there are some members who have no interest in the well being of their own Club's Wait Staff, even those members would, upon information and belief, still adhere to the custom of either tipping or paying a percentage-based charge that functions as a tip substitute, and, as a result, they would also be under the impression that the 18% or 20% charge added to the bill takes care of the Wait Staff's tip.

11

47.     Upon information and belief, the individual and group patrons who are nonmembers, and who comprise the bulk of the Country Club's banquet business, also adhere to the custom of paying either a tip or a charge that functions as a tip substitute, and would therefore likewise be under the impression that that the 18% or 20% charge added to the bill goes to the Wait Staff.

48.     Defendant has never told Plaintiffs that they do not deserve a pro rata share of the service charge, and it would be difficult for Defendant to make such a claim because each of their servers performs the work of a server, runner and busser combined.

49.     In addition, the servers' work at banquets is very strenuous (and potentially dangerous) when the Club is hosting more than banquet at the same time. To serve the guests on such occasions without disturbing the guests in other rooms, the banquet servers must walk down 10-12 steps, go through a hidden tunnel about 50 feet long, and then climb back up another 10-12 steps – all while carrying trays that have six plates with covers on them and hot food.

12

**Golf outings, tournaments and other special events
with service charges/gratuities
included in the price**

50. At all times mentioned herein, the Country Club periodically hosted golf outings, tournaments and other special events where breakfast, lunch, dinner and/or beverages were served to the guests.

51. For some of these events, an 18% or 20% service charge was added in place of the customary tip, and which patrons would naturally expect to be distributed to the Wait Staff.

52. For other such events, Defendant represented that the price "includes...gratuities," which, based on the Club's "Rules and Regulations," implies the equivalent of an 18% gratuity (and, in the absence of the Club's "Rules and Regulations," would naturally imply a comparable gratuity consistent with the amount of a customary tip).

53. Plaintiffs do not receive a share of the service charges/automatic gratuities that are included in the price of these events in place of the customary tip.

13

**The Country Club's unlawful practice
of depriving its Wait Staff employees of
notice of their rights under Labor Law § 196-d**

54.   Labor Law § 198-d requires every employer engaged in

the sale or service of food or beverages to post a copy of Labor Law § 196-d

in a place accessible to its employees and in a visually conspicuous manner.

55.   At all material times herein Defendant has failed to post a

copy of Labor Law § 196-d in a conspicuous and accessible location, and,

upon information and belief, has failed to post a copy of Labor Law § 196-d

anywhere on its premises.

56.   As a result of the Country Club's consistent and ongoing

violation of Labor Law § 198-d, the Wait Staff employees did not receive

notice of their rights under Labor Law § 196-d, and, as a result, many of

them failed to take action needed to enforce their rights earlier.

**The Country Club's use of deception and obfuscation
to keep skeptical and inquisitive banquet patrons
from learning the truth
about the "service charge"**

57.   Since the service charge is overwhelmingly understood to

be a tip substitute, few patrons ever have any reason to ask why it is added to

the bill.

14

58.    However, a small percentage of banquet patrons do ask about the service charge.

59.    Before this case was filed, Defendant often responded to such inquiries by telling the inquiring patron that "*It goes to offset the payroll*" or "*It's for the staff to offset the payroll.*"

60.    To a layperson, this "explanation" would seem to imply that the service charge is used to cover a portion of the Wait Staff's wages, but the phrase "*offset the payroll*" is arguably vague enough that Defendant could deny this and claim instead that it means the service charge also covers a portion of the wages of "back of house" employees with no direct service function (*i.e.*, the banquet chef, the banquet cook(s) and the dishwashers). However, such an alternative explanation for the phrase "offset the payroll" would be false in any event because the service charge is not given to these front and back of house employees (either directly, or indirectly, as part of their hourly wage).

61.    If questioned further about what "*offset the payroll*" meant, Defendant often continued to give the patron false, misleading and/or evasive answers (such as, "*It goes to pay the employees*"), and otherwise carefully avoided disclosing the fact that none of the service charge was given to the Wait Staff.

15

**Defendant's inadequate and short-lived effort
to cease its ongoing violations of Labor Law § 196-d**

62.     In February 2008 the Court of Appeals held that the

"clear and unambiguous" language of "Labor Law § 196-d can include

mandatory charges when it is shown that employers represented <u>or allowed</u>

<u>their customers to believe</u> that the charges were in fact gratuities for their

employees. An employer cannot be allowed to retain these monies."

*Samiento v. World Yacht, Inc.*, 10 NY3d 70, 81 (emphasis supplied).

63.     After that Court of Appeals' decision was issued,

Defendant made a half-hearted, wholly inadequate and short-lived effort to

reduce its ongoing exposure for violating section 196-d.

64.     Specifically, Defendant began temporarily adding partial

disclaimers to banquet contracts (in relatively small, single-spaced print)

informing the patron that the service charge is not a "*gratuity*," but a charge

that "*applies to all front and back of house staff salaries that are necessary

in making your affair the best it can be*," and further informing the patron

that tipping is appropriate for "*exceptional service*".

65.     Upon information and belief, Defendant's partial

disclaimer was not clear and conspicuous enough to defeat patrons'

reasonable expectation that the Wait Staff would receive either the service

16

charge, or all or most of the benefit thereof in the form of a higher wage in lieu of a customary gratuity.

66. Upon information and belief, those patrons who did read such a vaguely-worded disclaimer, and who wished to tip for "exceptional" service, would not leave a customary tip (*e.g.*, 18% or 20%), but would instead leave a very small tip since he or she would reasonably be under the impression that the Wait Staff is already receiving all or most of the benefit of the service charge in the form of a higher wage.

**The Country Club's decision to delete**
**the partial disclaimer,**
**and to revert back**
**to having no disclaimer at all**

67. Upon information and belief, the Country Club, through its Board of Directors (the "Board") and the officers and agents to whom it delegated authority, began to view the partial disclaimer (which they only reluctantly included in the banquet contracts) as an annoyance because it effectively invited patrons to ask questions about the purpose of the Club's so-called "service charge".

68. Upon information and belief, by about three weeks after adding the partial disclaimer to the banquet contracts, the Country Club, through its leadership, felt that its Wait Staff was unlikely to seek legal

17

redress for the Club's practice of withholding the service charge monies it collected.

69. Accordingly, upon information and belief the Country Club, through its Vice President, Gerard Villa, ordered the Club's General Manager, John Eramo, to delete the partial disclaimer from the banquet contracts altogether and to revert back to having no disclaimer at all.

70. Upon information and belief, the General Manager promptly did as he was ordered, and took the steps needed to ensure that his subordinates deleted any and all disclaimer language from the banquet contracts.

**The Country Club's attempt to conceal or minimize the record of its wrongdoing**

71. Upon information and belief, the Country Club continued to distribute banquet contracts with no disclaimer language whatsoever until after this lawsuit was commenced in early June 2008, at which point the Country Club hastily inserted new disclaimer language into the banquet contracts.

72. Upon information and belief, on or before July 6, 2008, the Country Club's President, "T.J." Galligan, asked Stephanie Bulone, the

18

Country Club's Director of Catering, to insert disclaimer language into the

fully executed contracts of events that already occurred or were scheduled to

occur and to convince the clients (the patrons) to sign the altered "contracts".

73.    Upon information and belief, Ms. Bulone told the

Country Club's President that she could not do that.


## FIRST CAUSE OF ACTION

## VIOLATIONS OF LABOR LAW ARTICLE 6

74.    Plaintiffs incorporate paragraphs 1 - 73 herein by

reference.

75.    Upon information and belief, by including a separate

charge for service for banquets, for patio and pool dining, and for special

events which corresponds to the percentage customarily paid as a gratuity

for fine dining in New York City, Defendant caused its patrons to believe

that their payment of the service charge "takes care of" the Wait Staff's

gratuity.

76.    Defendant's conduct as aforesaid violated the substantive

provisions of Labor Law article 6 (Labor Law §§ 196-d and 193[1]).

19

77.    Plaintiffs have been damaged in an amount to be determined at trial, and are entitled to a *pro rata* share of the service charges/automatic gratuities charged for (or attributable to) banquets, patio and pool dining, and special events (*i.e.*, the service charge/automatic gratuity minus the portion thereof that would have been paid to Wait Staff employees who are not parties to this action).

78.    As "employees" (Labor Law § 190[2]) whose "wages" (which, for purposes of Labor Law article 6, encompass any type of "earnings," Labor Law § 190[1]) were unlawfully withheld by their "employer" (Labor Law § 190[3]), Plaintiffs are also entitled to reasonable attorney's fees under Labor Law § 198 for Defendant's violations of the substantive provisions of Labor Law article 6 (Labor Law §§ 196-d and 193[1]).

79.    Upon information and belief, Defendant's ongoing violations of the substantive provisions of Labor Law article 6 (Labor Law §§ 196-d and 193[1]) were willful; instead of conducting itself as a not-for-profit entity, Defendant has conducted itself as if it were a for-profit entity with no regard for the rights of its Wait Staff employees or for the reasonable expectations of member and non-member patrons alike.

20

80.     Accordingly, Defendant is also liable under Labor Law §

198 for payment to Plaintiffs of a 25% penalty.

WHEREFORE, Plaintiffs respectfully request judgment in an

amount to be determined at trial, together with prejudgment interest,

statutory attorney's fees, a 25% statutory penalty, and the costs and

disbursements of this action.

Dated:      New York, New York
            July 18, 2008

                                    LAW OFFICES OF SCOTT A. LUCAS
                                    The Lincoln Building – Suite 1001
                                    60 East 42nd Street
                                    New York, NY 10022
                                    (212) 573-6906
                                    *Attorneys for Plaintiffs*

                                    By_____
                                        SCOTT A. LUCAS

21

# CERTIFICATION PURSUANT TO 22 NYCRR § 130-1.1a

SCOTT A. LUCAS, an attorney duly licensed to practice law in the State of New York, hereby certifies the truth of the following under penalty of perjury:

This Complaint is brought in good faith and is believed to be highly meritorious. To the best of my knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the presentation of this Amended Complaint is not frivolous as defined in 22 N.Y.C.R.R. § 130-1.1(c).

Dated: New York, New York
       July 18, 2008

_____
SCOTT A. LUCAS

22

# PROFESSIONAL INDEMNITY AGENCY, INC.

*37 Radio Circle Drive, P.O. Box 5000, Mount Kisco, New York 10549-5000   Telephone: (914) 241-8900   Facsimile: (914) 241-8045*

### PERSONAL AND CONFIDENTIAL

August 29, 2008

**VIA REGULAR MAIL**
**& FACSIMILE (212) 557-9610**

Mr. William Russo
Richmond County Country Club
135 Flagg Place
Staten Island, NY 10304

| | | |
|---|---|---|
| **RE:** | ***Insured:*** | ***Richmond County Country Club*** |
| | ***Claimant:*** | ***Rose Marie Reilly, et al*** |
| | ***Policy No.:*** | ***U708-30155*** |
| | ***Our Claim No.:*** | ***UNP-08-00411*** |

Dear Mr. Russo:

U.S. Specialty Insurance Company (hereinafter "USSIC" or "the Company") has requested and authorized the Claims Department at Professional Indemnity Agency, Inc. to adjudicate this matter on its behalf.

On behalf of USSIC, we again acknowledge receipt of the correspondence submitted in connection with the above-referenced matter, including a copy of the Complaint in the action entitled <u>Rose Marie Reilly, et al. v. Richmond County Country Club</u>. We have reviewed the documents and the supplemental information provided to us along with the terms and conditions of the above-referenced Policy. We take this opportunity to provide USSIC's initial coverage position relative to this matter. The following is subject to change.

### THE POLICY

USSIC issued to Richmond County Country Club (hereinafter the "Club" or the "Insured") a Non-Profit Organization Liability Insurance Policy, bearing Policy Number U708-30155 (hereinafter "the Policy"). The effective dates for coverage under the Policy are February 1, 2008 through February 1, 2009 (the **POLICY PERIOD**). This is a "claims made" policy and, as such, applies only to those **CLAIMS** that are first made against the **INSURED** during the **POLICY PERIOD**. Pursuant to Item 4 of the Declarations, the Policy provides a Limit of Liability of $5,000,000 for each **CLAIM** and in the aggregate for all **CLAIMS**, with a $5,000 deductible obligation per **CLAIM**. Pursuant to Endorsement No. 2 of the Policy, a separate Deductible of $7,500 applies to both **LOSS** and **DEFENSE COSTS** with respect to any **CLAIM** based on or arising out of allegations of **WRONGFUL EMPLOYMENT PRACTICES**; further, the Company shall only be liable to make payment in excess of the Deductible and subject to the Limit of Liability of the Policy.

Mr. William Russo
August 29, 2008
Page 2 of 8



## FACTS OF THE CLAIM

Based upon the information provided, this matter arises from a Complaint filed on or about July 24, 2008, by one former employee and thirteen current employees of the Club, in the Supreme Court of the State of New York, in Richmond County (the "Complaint"). The Plaintiffs were and/or are employed by the Club as banquet servers, bartenders or Maitre d', and are asserting allegations against the Club on behalf of themselves and on behalf of present and former wait staff employees of the Club. The Complaint arises solely from alleged wage and hour law violations.

The Complaint sets forth a single cause of action: Violations of Labor Law Article 6, § 196-d and § 193[1]- for unlawful practice of withholding the wait staff's wages, including gratuities.

The Complaint alleges that the Club has a well established practice of adding a service charge of 18% or 20% to its patrons' bills for banquets and outdoor dining service. While the service charge is purported to be a tip substitute and the patrons understand it to be a tip substitute, the Plaintiffs argue that the Club retained the service charge as part of payment to the Club and failed to give the wait staff any portion of the service charge. It is further alleged that the Club's Rules and Regulations specifically state that the service charge added to the patron's bill is a tip substitute.

On behalf of an alleged class of current and former wait staff of the Club, the Complaint seeks, among other things, the following:

- Damages for the amount of unpaid wages;
- Reasonable attorney's fees ; and
- 25% penalty under Labor Law §198.

We understand and appreciate that the Insured denies the allegations set forth in the Complaint.

## APPLICABLE POLICY PROVISIONS/RESERVATION OF RIGHTS

Without intending to comment on the veracity of Plaintiffs' allegations, we direct your attention to certain terms and conditions of the Policy which may affect coverage for this matter. Please be advised that the following is based upon information provided to the Company to date and may be subject to change in the event further or different information becomes available.
We first direct your attention to Sections I. and II. of the Policy, which provide coverage as follows:

**I.     INSURING AGREEMENT**

The Company shall pay on behalf of the **INSURED** all **LOSS** and **DEFENSE COSTS** that the **INSURED** becomes legally obligated to pay solely because of a **CLAIM** first made against the **INSURED** during the **POLICY PERIOD** … for a **WRONGFUL ACT** committed or allegedly committed by the **INSURED**.

Mr. William Russo
August 29, 2008
Page 3 of 8



**II.       DEFENSE, INVESTIGATION AND SETTLEMENT OF CLAIMS**

As respects such insurance as is afforded by this Policy, the
Company shall have the right and duty to defend, including the
selection of counsel, any **CLAIM** against the **INSURED** seeking
damages for **LOSS**, even if any of the allegations are groundless,
false or fraudulent.  The Company shall have the right to make
such investigation, negotiation and settlement of any **CLAIM** as it
deems appropriate, subject to the rights of the **INSURED** as set
forth in Clause VII(G)(1)[1].

Pursuant to Section III.A. of the Policy, as amended by Endorsement No. 6, **CLAIM** means:

1.       a written demand for monetary relief;

2.       a civil, arbitration, regulatory or administrative proceeding for
monetary relief which is commenced by:

a.   service of a complaint or similar pleading;

b.   demand for arbitration or similar document; or

c.   receipt of notice of charges or similar document.

The Plaintiffs brought a civil action against the Club on or about July 24, 2008, seeking damages
and statutory penalties.  We note that this matter appears to be a **CLAIM** under your USSIC
Policy and therefore triggers coverage subject to the Policy's terms, conditions and limitations.

As defined at Section III.C. of the Policy, as amended by Endorsement No. 5,

**INSURED** means the **ORGANIZATION** set forth in Item 1 of
the Declarations, and any past, present or future duly elected or
appointed Directors, Officers, Trustees, Employees, Volunteers or
Committee Members of the **ORGANIZATION** in their capacity
as such, or the estates, heirs legal representatives or assigns of such
persons who are deceased or incompetent, and

1.       Any non-profit subsidiary created during the
**POLICY PERIOD**;

2.       Any non-profit subsidiary acquired subsequent to
the inception date of this Policy, but only for a
period of 180 days from the date of acquisition or
up to the end of the **POLICY PERIOD**, whichever
is less.  If coverage is desired beyond the foregoing
term, the **ORGANIZATION** must make a specific

---

[1] See Endorsement No. 5.

Mr. William Russo
August 29, 2008
Page 4 of 8



written application to the Company requesting coverage for this subsidiary;

3.      If the Company agrees to provide such coverage under Clause VII(B), any for-profit subsidiary created or acquired during the **POLICY PERIOD**; and

4.      The spouses or domestic partners of any past, present, or future duly elected or appointed Directors, Officers, Trustees, Employees, Volunteers or Committee Members of the **ORGANIZATION**, or the estates, heirs, legal representatives, or assigns or such persons, but only to the extent that **CLAIMS** are asserted against such spouses or domestic partners arising solely out of any actual or alleged **WRONGFUL ACT** of the spouse who is insured under this definition.

5.      Any outside position of a director, officer, trustee or other equivalent position held by any of the directors, officers or trustees of the **ORGANIZATION**, at any other non-profit entity, if service in such position is at the specific request and direction of the **ORGANIZATION**.

As indicated in Item 1 of the Declarations, the **ORGANIZATION** is Richmond County Country Club, a named Defendant in this matter.

The term **DEFENSE COSTS** is defined at Section III.B to mean "fees and expenses incurred in defending, investigating or appealing a **CLAIM** insured herein."

> **DEFENSE COSTS** shall not include fees and expenses incurred with respect to any criminal action or proceeding, or with regard to any salary charges of regular employees or officials of [USSIC] nor salary or wages of the Insured.

We understand that you have engaged services of outside counsel, Richard S. Mills, Esq. prior to reporting this matter to the Company. Please be advised that any fees or expenses incurred by the **INSURED** in connection with this matter prior to reporting it to the Company do not constitute **DEFENSE COSTS** within the meaning of the Policy and do not operate to reduce the deductible. (See also Section VII.G.2., as amended by Endorsement No. 5.)

The term **LOSS** is defined at Section III.D., as amended by Endorsement No. 5, to mean "the amount paid by [USSIC] on behalf of the **INSURED** for damages, judgments, and settlements with respect to **CLAIMS** for which coverage hereunder applies[.]"   However, **LOSS** shall not include:

> . . . any amount which the **INSURED** is not legally obligated to pay . . . any civil or criminal fines, penalties, sanctions or taxes,

Mr. William Russo
August 29, 2008
Page 5 of 8



> any punitive or exemplary damages or the multiplied portion of any multiplied damage award, or any matters which may be deemed uninsurable under the law pursuant to which this insurance shall be construed.

As you are aware, the Complaint seeks damages for unpaid wages, including gratuities which were collected from the Club's patrons as a tip substitute, but not distributed to the Plaintiffs, and 25% of unpaid wages as statutory penalty under the Labor Law §198. **Because the Plaintiffs/Class members are alleging damages for wages owed but not paid, such unpaid wages and/or gratuities constitute restitution, and are uninsurable as a matter of law. As such, USSIC denies any obligation to indemnify the Club for any amounts (including unpaid wages and/or gratuities) attributable to violations of New York Labor Law Article 6, which constitute restitution or disgorgement.**

Further, the Complaint seeks 25% of unpaid wages pursuant to New York Labor Law §198. Pursuant to Section III.D. above, as amended by Endorsement No. 5, USSIC denies any obligation to indemnity you for any settlement, judgments or awards that constitute civil or criminal fines, penalties or sanctions in connection with the Complaint. **USSIC expressly denies any obligation to indemnify the INSURED for any damages, judgment and/or settlement as provided for by the Labor Law §198 because such settlement, judgment or award, including a 25% of unpaid wages, constitutes a civil fine, penalty and/or sanction and does not constitute a covered LOSS as contemplated by the Policy. Any settlement, judgment or award which does not constitute a covered LOSS as contemplated by the Policy will be at the INSURED's own expense.**

The term WRONGFUL ACT is defined at Section III.I. of the Policy to mean "any error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted or allegedly committed or attempted by any INSURED, individually or otherwise, in an INSURED capacity, including WRONGFUL EMPLOYMENT PRACTICES, PERSONAL INJURY or THIRD PARTY DISCRIMINATION."

The Complaint alleges that the Club unlawfully withheld wages and/or gratuities from the wait staff, including the Plaintiffs/Class members. USSIC reserves its rights, including the right to deny coverage, as to whether this matter constitutes a "WRONGFUL ACT" as contemplated by the Policy.

As set forth at Section VII.A.1. and 2. of the Policy, USSIC's obligation to pay a covered LOSS is subject to and shall never exceed the Limit of Liability of $5,000,000 for each CLAIM and in the aggregate for all CLAIMS, as set forth in Item 4 of the Declarations. A deductible of $7,500 applies to both LOSS and DEFENSE COSTS. (See also Endorsement No. 2 and No. 5.)

We finally direct your attention to Section V. of the Policy entitled "EXCLUSIONS," as amended by Endorsement No. 6, cited in relevant part below:

V.    EXCLUSIONS

This Policy does not apply to any CLAIM:

\*        \*        \*

Mr. William Russo
August 29, 2008
Page 6 of 8



E.   based on any **WRONGFUL ACT**, which is, or alleged to
be … a willful or reckless violation of any statute, or any
conduct which is dishonest, willful, malicious, fraudulent
or otherwise intended to cause damage to persons or
property …

\*        \*        \*

The Complaint contains a single cause of action for alleged violations of various New York
Labor Law Sections for withholding wages and/or gratuities. The Plaintiffs further alleged that
the aforementioned statutory violations were willful and seek, among other things, statutory
penalty as punitive damages. Accordingly, the Company reserves all rights, including the right
to deny coverage to the extent this matter is based on Wrongful Acts which are or are alleged to
be "willful or reckless" statutory violations and/or "any conduct which is dishonest, willful,
malicious, fraudulent or otherwise intended to cause [Plaintiffs' alleged damages]," based upon
Exclusion E., as amended by Endorsement No. 6, cited above. USSIC **denies any obligation to
indemnify the Club in connection with any damages, judgment or settlement which is the
result of or attributable to conduct which is expressly excluded from coverage by Section
V.E. above, including any amounts attributable to any violation of law.**

In addition to the foregoing, USSIC expressly reserves all rights, privileges and coverage
defenses, including, but not limited to, Section VII.A.3, which states: "This insurance is excess
of any other valid and collectible insurance available to the INSURED, whether such insurance
is stated to be primary, contributory, excess, contingent, or otherwise, unless such other
insurance is written only as a specific excess insurance over the Limit of Liability stated in Item
4 of the Declarations of this Policy." USSIC specifically reserves its right to take the position
that this Policy is excess of any other insurance available to the Club or other Insured. In
accordance with Sections VII.A.3. and VII.F.1., **we request that you provide copies of any and
all other insurance policies to which the relevant facts and circumstances of this matter
have been reported and which may provide coverage for this matter, including a copy of
the Club's General Liability Insurance Policy.**

Finally, we direct your attention to Section VII.F.1. of the Policy, which states in relevant part,

F.   **NOTICE:**

As a condition precedent to the **INSURED'S** right to coverage
under this Policy, the **INSURED** shall:

1.   give written notice to the Company as soon as practicable
of any **CLAIM** made against the **INSURED**,……..
cooperate with and assist the Company and its
Representatives, as the Company may require, in the
settlement, defense, appeal and/or investigation of such
Claim[.]"

Also, we take this opportunity to remind you of your obligations under Section VII.F.1. of the
Policy by which the Insured is obligated to cooperate and assist the Company in the settlement,

Mr. William Russo
August 29, 2008
Page 7 of 8



defense, appeal and/or investigation of the Claim. **Therefore, we ask that you provide the undersigned with the following information:**

1. **copies of personnel files of the fourteen named Plaintiffs;**

2. **copies of payroll information of the fourteen named Plaintiffs;**

3. **copies of the banquet services contracts with or without the service charge disclaimer as referenced in the Complaint.**

### DEFENSE STRATEGY

Subject to the foregoing reservation of rights, this will confirm that USSIC has agreed to provide a defense to Richmond County Country Club in connection with this matter. As you are aware, USSIC has agreed to retain, at the request of the Insured, **Richard S. Mills, Esq.** of the law firm of **McElroy, Deutsch, Mulvaney & Carpenter** to represent the Club in connection with the allegations of the Plaintiffs.

**We have requested that Mr. Mills forward all legal bills related to this matter to the Insured for payment (with copies to the undersigned) until the applicable $7,500 deductible has been exhausted.** Once the deductible obligation has been met, all further invoices should be forwarded to the Company for payment.

### CONCLUSION

In addition to the foregoing, USSIC specifically reserves the right to afford or deny coverage based upon grounds other than those expressly set forth in this letter and to supplement and/or amend this letter to address additional coverage issues as they may arise, based upon all the provisions, terms, conditions, exclusions, endorsements and definitions found in the Policy as well as any additional facts which may come to the attention of the Company.

Nothing stated herein, nor any further action taken by USSIC or anyone acting on its behalf, shall be construed as a waiver of any rights, remedies or defenses under the Policy. To the contrary, by providing this and any prior or subsequent correspondence to you, engaging in any prior or subsequent discussions with you, or paying or agreeing to pay any amount to or on behalf of any Insured(s), USSIC specifically reserves all rights, remedies or defenses belonging to it under the Policy or any other policy issued by USSIC or any of its affiliates. USSIC further reserves the right to assert any defenses or reservations of rights determined to exist, including the right to deny coverage, to have a court determine whether there is (or ever was) any coverage for this matter, and to withdraw from the defense and recoup costs incurred in the event it is determined that coverage hereunder does not apply. We understand and appreciate that the rights of the Insured equally are reserved.

Please be advised that the above is based upon the Company's present understanding of this matter and the information currently in our possession and is subject to revision and/or supplementation.

Should you have any questions or concerns regarding the Company's coverage position or anything stated herein, or if you have additional information which you believe may affect the

Mr. William Russo
August 29, 2008
Page 8 of 8



Company's position, please do not hesitate to contact the undersigned at 914-218-9757 or mipark@piaint.com.

Sincerely,

Mindy H. Park
Claims Attorney

cc:     Carolyn Wilson
        Aon Association Services
        1120 20th Street, NW 6th Floor
        Washington, DC 20036
        (Via E-Mail: Carolyn_Wilson@asg.aon.com)